**STATE of Missouri, Respondent,**

v.

**Sean M. QUICK, Appellant.**

**No. WD 71058.**

Missouri Court of Appeals,
Western District.

Feb. 1, 2011.

As Modified March 1, 2011.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 1, 2011.

Application for Transfer Denied
April 26, 2011.

604

Frank K. Carlson, Union, MO, for appellant.

Shaun J. Mackelprang and Richard A. Starnes, Jefferson City, MO, for respondent.

Before Division One: JAMES M. SMART, JR., P.J., MARK PFEIFFER and CYNTHIA L. MARTIN, JJ.

JAMES M. SMART, JR., Judge.

Sean Quick appeals his convictions and associated sentences for first-degree promoting child pornography and possession of child pornography. He claims on appeal that the trial court erred in evidentiary rulings and in instructing the jury. The judgment is affirmed.

## Facts

Sean Quick was charged with one count of felony promotion of child pornography in the first degree (by offering files through file-sharing) in violation of section 573.025 and two counts of felony possession of child pornography in violation of section 573.037 RSMo 2000. Count I alleged that defendant Quick, "knowing its content and character, offered or agreed to provide obscene material consisting of a video that portrays what appears to be a person under the age of fourteen years as a participant in sexual conduct." Count II alleged that defendant, "knowing its content and character, possessed obscene material consisting of a video, which portrays what appears to be a person under the age of fourteen years as a participant of sexual conduct."

Quick filed a motion to suppress statements allegedly made to police on the day his computer was seized by police on the grounds that said statements were obtained from Quick in violation of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The trial court denied the motion, ruling that Quick was not in custody when the statements were made. The objection to the statements was renewed at trial. The objection was overruled. The trial court allowed testimony related to his oral statements to police in an interview that the court determined was a voluntary non-custodial interview.

At trial, the State presented evidence that, on November 30, 2007, two detectives from the Boone County Sheriff's Department went to Quick's apartment in Boone County without a search warrant to see if he would be willing to voluntarily discuss a matter they were investigating. Detective Perkins had received information that Quick was an internet subscriber whose IP address had come back as accessing potential child pornography. Through the IP address, the detectives located the physical address of the internet account holder, which was Quick's apartment.

Quick answered the door and met the two plain-clothes detectives, who identified themselves and informed Quick why they were there. They asked if they could come in. According to the undisputed testimony of the officers, Quick replied "that would be fine" and invited them in, saying also that he would be "getting ready" to go to work.

Detective Perkins asked Quick about his internet use and file-sharing. She testified that Quick told her that he participated in

file-sharing of pornography and had downloaded child pornography through file-sharing, because he was curious about how easy it was to obtain after watching a television episode related to law enforcement as to child pornography. He did not specifically say whether or not he actually viewed the files he had downloaded, but he said that he decided it was "silly" or "wrong" to have the images and that he "got rid of them" and "dumped them into the recycle bin."

Detective Perkins testified that she asked Quick for permission to run a program on his computer designed to scan the computer and present thumbnails of any images that appeared to correspond to typical patterns of child pornography. Quick agreed and voluntarily signed a form used by the police department to authorize use of the program. Detective Sullivan ran the program on Quick's computer. Sullivan conducted a preview of the computer using the program searching the hard drive for graphic files. Sullivan saw several images that appeared to be child pornography. Detective Sullivan asked Detective Perkins to review the images. The officers testified that based on their observation of images on the hard drive, they decided to seize the computer in order to more thoroughly evaluate what was on the computer. The propriety of the seizure of the computer is not at issue in this case.

Captain Scott Richardson of the University of Missouri Police Department testified that he conducted a forensic examination of Quick's hard drive and located files that appeared to be child pornography. Richardson described in detail two particular video files, State's Exhibits 16 and 17. He described State's Exhibit 17 as depicting two young girls who are exposing their vaginal area and another little girl who is completely unclothed. Captain Richard-

son said the video depicted a person using a sex object (a so-called "sex toy") being used on the vagina of the unclothed little girl. The file name of Exhibit 17 was "Euman Hindoo Prostitute 10Ans–2–1 (Hussyfan) (Pthc) (R@Ygold) (Babyshivid) (India Lolita) [24481]." That file was created July 4, 2007.

Richardson also described the other exhibit, No. 16, which, according to the testimony, reveals a helpless young girl who is tied with rope (including a rope around her neck) and is subjected to multiple instances of forcible rape and sodomy and other sexual abuse by an unidentified and malevolent oppressor whose face is not disclosed to the camera. The file name of Exhibit 16 is "Ped–Vicky Compilation (Pthc) 10yo Kiddy Reality Child Get's What she Wants—All Kinds of F* * *." That file was shown as being created April 5, 2007. There is no contention on appeal here as to the sufficiency of the evidence. Nor is there any doubt that the exhibits, as described in the testimony, and especially Exhibit 16, constituted vicious child pornography.

The defendant waived objection as to the admission of Exhibit 17. The court admitted Exhibits 16 and 17, with Exhibit 16 admitted over the defense objection. The State published to the jury portions of State's Exhibits 16 and 17, also over defense objection. Defense counsel objected on grounds that they were being published only to elicit the prejudices and sympathy and emotions of the jury. The defense argued that they should not be published to the jury at all, even in portion, because the defense had stipulated that the files contained child pornography and because they were both described verbally. After publication to the jury, the State rested.

The defense presented an expert witness on file-sharing to hypothesize that because only seven files on Quick's hard

drive contained child pornography (out of 651 shared files), perhaps the illegal files were downloaded by various viruses that infected the computer and were not intentionally downloaded. The expert acknowledged that he could not demonstrate that any virus caused the download of the child pornography. The defense rested after presenting this expert testimony.

At the instruction conference, defense counsel objected to Instructions 6, 7, 8, 9, and 10, on grounds that they instructed the jury to find Quick guilty if he was "aware" of the content and character of the videos found on his computer, although "aware" posits a lesser mental state than "knew," which was the language used in the statutes under which Quick was charged. The objections were overruled.

The jury returned verdicts of guilty on both Counts. The trial court sentenced Quick to eight years for Count I and four years for Count II, to be served concurrently in the Missouri Department of Corrections.

Quick appeals. He does not challenge the sufficiency of the evidence resulting in his convictions.

### Point I

Quick claims the trial court erred in overruling his attempts to preclude admission of videos at trial that he says were highly inflammatory, cumulative, duplicative, irrelevant, and not probative. Quick further argues that any probative value the videos might possess was outweighed by their prejudicial effect. He says he stipulated that the videos contained child pornography, other witnesses described the content and character of the videos, and the only purpose served by the publication of the videos was to inflame the passion of the jury against him.

Quick's claim regarding State's Exhibit 17 is not preserved because he affirmatively stated that he had no objection to the exhibit. Such a declaration waives even plain error review of a claim. *State v. Johnson*, 284 S.W.3d 561, 582 (Mo. banc 2009). Quick's claim regarding Exhibit 16 *is* preserved because he objected to the admission and the publication of that video.

If the undisputed testimony of Captain Richardson is believed, Quick is correct that Exhibit 16 was inflammatory—indeed, not only inflammatory, but no doubt practically trauma—inducing as well. But that does not end our inquiry, because even the most heinous and graphic and upsetting videos and photos may be admitted within the court's discretion when they are legally relevant because the high degree of logical relevance outweighs the risk of prejudice and confusion. *See State v. Davis*, 318 S.W.3d 618, 640 (Mo. banc 2010).

The trial court has broad discretion in the admission of evidence, and review is for abuse of that discretion. *State v. Reed*, 282 S.W.3d 835, 837 (Mo. banc 2009). An abuse of discretion is found only where the court's ruling is "clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *State v. Johnson*, 207 S.W.3d 24, 40 (Mo. banc 2006). If reasonable persons may differ as to the propriety of an action taken by the trial court, then there was no abuse of discretion. *Id.* Further, prejudice also must be demonstrated from the admission of the evidence. *Reed*, 282 S.W.3d at 837.

To be admissible, evidence must be both logically and legally relevant. *State v. Anderson*, 76 S.W.3d 275, 276 (Mo: banc 2002). Evidence is logically relevant

if the evidence tends to make the existence of material fact more or less probable. *Id.* Evidence is legally relevant if its benefits outweigh its costs, including unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness. *Id.*

■ To prove the charged offenses, the State had to prove that the videos contained what appeared to be obscene material (material that has prurient interest in sex as its predominant appeal and depicts sexual conduct in a patently offensive way lacking any serious other value) that included as a participant or observer a child of less than fourteen years of age. *See* sections 573.025.1, 573.010, and 573.037.1. The actual videos were highly logically relevant because they evidenced their own content. *See Davis*, 318 S.W.3d at 640 ("While the videotape footage and still photographs made from that footage were highly disturbing, they were first-hand recorded accounts of the crimes charged in this case and so were of supreme probative value.").

While it must certainly be true that Exhibit 16 was shocking, graphic, and greatly disturbing, there is no indication from the record that there was any attempt by the State to dramatize or exaggerate its content. Indeed, Quick fails to point out from the record the precise portions of Exhibit 16 shown to the jury; he does not argue that the State somehow presented a distorted picture of what was really in the video. If the portions shown the jury were abominable, that would be no surprise because the testimonial description of Exhibit 16 suggests that the entire video was abominable.

There is always, of course, a risk of prejudice to the defendant when the jury is allowed to see something that is horrible. *See id.* In *Davis, supra,* the defendant had videotaped and photographed his own hellish actions in tying up, torturing, forcibly raping, forcibly sodomizing, and murdering his victim. The Court noted that while the evidence was "potentially prejudicial," any potential prejudice arose from "the gruesome nature of [the] crimes, not from any action of the State in the method of presenting the footage and photographs." *Id.*

Here, there is no allegation that the defendant, unlike the defendant in *Davis,* had anything to do with the staging and production of the videos, but it makes sense that the principle is the same where the crime charged is the possession and the offering of the videos. In this case, the State was required to present evidence demonstrating the nature of the charged crimes as involving the knowing possession and the knowing offer to others of materials absolutely prohibited by law. True, the evidence was shocking, but "[t]o exclude graphic evidence solely because it is graphic would deprive the State of evidence when it needs it the most: the evidence would be inadmissible to prosecute what are typically the most serious crimes." *State v. Mayes,* 63 S.W.3d 615, 632 (Mo. banc 2001). We do not attempt to equate a possessor and offeror of such videos with those who produce them, but the fact is that any encouragement and use of any such production is contrary to the public welfare and has been made a crime also. The greater the horror of such a video, the greater is its logical relevance. To keep jurors from all personal exposure to the character and content of a child pornography video is to downplay the very essence of the crime.

It is true, of course, that the court and the State must exercise discretion so as to avoid unnecessarily inflaming or traumatizing a jury. Here, the State, with the court's approval, attempted to minimize the jury's exposure to the entirety of both

videos by playing only brief portions of each.

 Quick argues that admission and publication of the videos was unnecessary, because he stipulated that the videos contained child pornography and because witnesses described the contents of the videos. He overlooks the fact that in his motion for judgment of acquittal after trial, Quick claimed that the State failed to present sufficient evidence that the videos were child pornography, that the videos were obscene, or that the videos portrayed "what appeared to be a person under the age of fourteen years as a participant in sexual conduct." While that submission may have been no more than a boilerplate contention rather than an earnest argument, it still demonstrates that natural desire of the defense to control the extent to which the evidence comes in, and then after it is in, to argue that the evidence was insufficient. In any event, even though there was testimony describing the videos, and even though Quick offered to stipulate that the videos were child pornography, "a photograph is not rendered inadmissible because other evidence may have described what is shown in the photograph; nor is the State precluded from introducing the photograph because the defendant expresses a willingness to stipulate to some of the issues involved." *State v. Schneider*, 736 S.W.2d 392, 403 (Mo. banc 1987).

We conclude that the trial court could reasonably have found that the legitimate probative value of admitting the videos and allowing publication of portions of the videos outweighed the risk of prejudice. The point is denied.

### Point II

Quick claims the trial court erred in overruling his motion to suppress statements and his subsequent objections at trial to the admission into evidence of statements he made to law enforcement officers. He says the statements were made while he was in custody and without *Miranda* warnings. Quick asserts that his constitutional rights against self-incrimination were violated. Quick asserts that he was in custody because a reasonable person under such circumstances would not have felt free to leave. He points out that a criminal suspect is entitled to *Miranda* warnings, consistent with the Fifth Amendment right against self-incrimination, once the suspect is subjected to a "custodial interrogation." *State v. Gaw*, 285 S.W.3d 318, 321 (Mo. banc 2009).

 In Missouri, "custodial interrogation" is questioning initiated by law enforcement officers after a person has been placed under arrest or subjected to "arrest-like restraints." *State v. Glass*, 136 S.W.3d 496, 508 (Mo. banc 2004). Missouri courts analyze issues regarding the privilege against self-incrimination claimed under the Missouri Constitution in a manner consistent with analysis of those arising under the federal constitution. *State ex rel. Munn v. McKelvey*, 733 S.W.2d 765, 767 (Mo. banc 1987).

 "Custodial interrogation" occurs when a suspect is formally arrested or when under other circumstances the suspect is "deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602. While any police interview of a person who learns he or she is a suspect will often seem intimidating and even coercive to the person who is the suspect, the mere fact that the officers regard the person as a suspect does not require that the interview begin with *Miranda* warnings. *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). A person being asked preliminary investigative questions by police is

generally not in custody and need not be advised of his rights under *Miranda.* *See* *State v. Haslett,* 283 S.W.3d 769, 784 (Mo. App.2009).

"In reviewing a trial court's ruling on a motion to suppress, there must be 'substantial evidence' to support the ruling." *Gaw,* 285 S.W.3d at 319. "[T]he facts and reasonable inferences from such facts are considered favorably to the trial court's ruling and contrary evidence and inferences are disregarded." *Id.*

"In reviewing the trial court's overruling of a motion to suppress, this Court considers the evidence presented at both the suppression hearing and at trial to determine whether sufficient evidence exists in the record to support the trial court's ruling." *Id.* "Deference is given to the trial court's superior opportunity to determine the credibility of witnesses." *Id.* at 320. "This Court gives deference to the trial court's factual findings but reviews questions of law *de novo.*" *Id.*

Ordinarily, suspects are in custody when they have been informed that they are under arrest or when restraints have been placed on them. *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602. "When there is no declaration of arrest, and no physical restraint, the usual assumption is that a suspect is not in custody." *State v. Brooks,* 185 S.W.3d 265, 273 (Mo.App. 2006). However, there are factors that could potentially show that the police have actually taken custody of the suspect, even though there is no formal declaration of arrest and no handcuffs or other physical restraints placed on the suspect. *See, e.g., State v. Tally,* 153 S.W.3d 888, 894 (Mo. App.2005) (suspect in marijuana field ordered around by officers while a police helicopter hovered nearby overhead).

In deciding whether a suspect is "in custody" at a particular time, courts examine the extent of the restraints placed on the suspect during the interrogation in light of whether a reasonable person in the suspect's position would have understood the situation to be one of custody. *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). "Custody is determined by an examination of the totality of the circumstances." *State v. Werner,* 9 S.W.3d 590, 595 (Mo. banc 2000).

In arguing that he was "in custody," Quick relies on *United States v. Griffin,* 922 F.2d 1343 (8th Cir.1990), which discussed six factors to be evaluated in determining whether or not an interrogation is custodial. In *Griffin,* some FBI agents were investigating an armed robbery of a bank. They showed up at Griffin's home to talk to him about the robbery in the evening and were allowed in by Griffin's stepfather, who was anticipating that Griffin would return home soon. When Griffin arrived, about an hour later, the agents met him at the front door and told him they would like to talk to him concerning a bank robbery. Griffin was then questioned for about two hours. He was not told whether he was under arrest or that he could ask the officers to leave. When he got up to get cigarettes, one of the agents accompanied him to another room to retrieve the cigarettes. At the conclusion of the interview, the agents formally arrested him for the robbery. *Id.* at 1346. The trial court found that the interview was not a custodial interrogation and held that the statements he made during the extensive interrogation need not be suppressed. The Eighth Circuit Court of Appeals reversed, concluding that the interview was a custodial interrogation, and applied an analysis mentioning factors that tended to "mitigate" or "aggravate" the degree of restraint and, accordingly, the custody determination. *Id.* at 1349.

■ While *Griffin* remains a pertinent decision, its significance as a formulaic case has diminished as a result of other decisions, both state and federal. The *Griffin* factors include such things as the accused's actual and perceived freedom to leave, and the purpose, location, and length of the interrogation. *See Werner,* 9 S.W.3d at 595 (*citing Griffin,* 922 F.2d at 1348). Other factors mentioned in *Griffin* include whether the suspect was informed that the questioning was voluntary and whether the suspect was informed that he was free to leave or was not considered under arrest; whether the suspect actually possessed unrestrained freedom of movement; whether the suspect initiated the contact or voluntarily acquiesced to police requests for questioning; whether strong-arm tactics or deception were employed; whether the atmosphere of questioning was police-dominated; and whether the suspect was placed under arrest at the end of questioning. *Id.* This list of factors is not exhaustive, *id.,* and all of the pertinent factors must be considered in context. *Id.* at 598. The inquiry as to whether or not a subject was in custody focuses on the *totality of all the circumstances* surrounding the interrogation to determine whether or not a reasonable person would have felt he was at liberty to terminate the interrogation. *State v. Hill,* 247 S.W.3d 34, 47 (Mo.App.2008).

A pertinent Eighth Circuit ruling in 2002, twelve years after *Griffin,* involved an interview of a child pornography suspect at his residence. *United States v. Axsom,* 289 F.3d 496 (8th Cir.2002). In *Axsom,* federal agents showed up at the suspect's residence to execute a search warrant for the child pornography. They informed the suspect that he was not under arrest, though they were executing the search warrant. *Id.* at 497–98. The agents said they would like to talk to him. He said he was willing. Once, during the questioning, he stood up. Because there were several weapons nearby, the officer said, "hold on just a minute," and then, upon learning that the suspect had "dry mouth," the officer instructed the other agent to get him a glass of water. In the one-hour interview, the defendant admitted that he had downloaded child pornography. *Id.* at 498. The court held that the suspect was not in custody and, therefore, was not entitled to *Miranda* warnings. *Id.* at 503.

The *Griffin* factors are not a concrete test but are simply factors (a non-exhaustive list of possible factors) to be considered in the totality of the circumstances. But the analysis need not be couched in terms of the *Griffin* factors. In *United States v. LeBrun,* 363 F.3d 715 (8th Cir. 2004) (en banc), *cert. denied,* 543 U.S. 1145, 125 S.Ct. 1292, 161 L.Ed.2d 105 (2005), the Eighth Circuit analyzed the question of whether a person was "in custody" without citing *Griffin* or listing the *Griffin* factors. *See Hill,* 247 S.W.3d at 46. Also, in another case decided the same year, *United States v. Czichray,* 378 F.3d 822, 827–28 (8th Cir.2004), the court said of its own *Griffin* decision:

> There is no requirement ... that the *Griffin* analysis be followed ritualistically.... *The ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest. And the court must consider whether the historical facts, as opposed to the one-step-removed Griffin factors, establish custody.* The debatable marginal presence of certain *judicially-created* factors that ostensibly tend to "aggravate the existence of custody" cannot create the *functional equivalent of formal arrest* where the most important circumstances show its absence.

In *Czichray,* FBI agents wished to talk with a chiropractor that they suspected of being involved in health care billing fraud. 378 F.3d at 825. They showed up at his front door at 6:30 in the morning. They said they wanted to talk to him but that he was not required to talk to them. He allowed them in. What followed was seven hours of "interview." About three hours into the interview, the suspect informed the agents that he was late for work. The agents instructed him to call in sick and directed him not to inform his office of the investigation. He complied. When he moved about his home to go to the bathroom or the bedroom, an agent accompanied him to make sure he did not use the phone. He was told on more than one occasion that he did not have to cooperate and was also told that if he did not cooperate, the agents would still go forward with the investigation, with possible consequences to him, because they would contact the pertinent insurance companies and also would interview his seventy-five year old father. The district court, relying on *Griffin,* suppressed the written statement that the defendant gave that day to the agents. *Id.* The Eighth Circuit reversed the district court, determining that the chiropractor was not in custody, holding that he had not been restrained as though he were under formal arrest. *Id.* at 828. The court determined that a reasonable person in the suspect's position would not have understood the situation to be one amounting to the functional equivalent of formal arrest. *Id.* at 830. *See also Berkemer,* 468 U.S. at 442, 104 S.Ct. 3138; *Hill,* 247 S.W.3d at 47.

In *LeBrun* and *Czichray,* the court seemed to be recapturing its *Griffin* analysis from an approach that seemed at times to be more subjective and speculative rather than objective as to the reality of the total circumstances.[1]

■ We find no United States Supreme Court precedent exactly on point with the facts here. Accordingly, we look to the principles we can distill from pertinent Missouri cases such as *Brooks* and *Hill,* and to the other federal cases, to determine whether a reasonable person in Quick's circumstances would have believed that he was under arrest, or under the functional equivalent of under arrest, when he made the statements as to the child pornography that were allowed into evidence.

We return for a moment to a review of the pertinent facts in this case. The only witnesses to testify as to the circumstances of the interrogation were Detective Tracy Perkins and Detective Mark Sullivan. The defense cross-examined the officers but presented no other evidence on the issue at the suppression hearing or at trial. The officers testified that when they contacted Quick and explained why they were there, Quick was cooperative and invited them in, though he said he was "getting ready" to go to work. The officers testified that Quick talked freely with them, acknowledging his participation in file-sharing and downloading of "adult pornography." He also said that he had "come across child pornography" and had downloaded it out of curiosity but then had disposed of it. There is no evidence that he expressed any hesitation or resistance to discussing matters with the officers or giving his consent

1. The Missouri case of *State v. Werner, 9 S.W.3d 590* (Mo. banc 2000), involved the interrogation of a juvenile who was picked up at a school without notification to the juvenile's parents. The juvenile was taken to the police station and interrogated without warning until he confessed. In a case such as *Werner,* the subjective aspects of the *Griffin* test may be particularly relevant because of the age of the suspect.

to run the preview program on his computer.

The conversation occurred in the living room of Quick's own apartment, which Quick had invited the detectives into after being advised of the purpose of the investigation. Quick agreed to speak with the detectives. The detectives were dressed in plain clothes and had no visible weapons. Quick gave a signed consent allowing his computer to be searched. Quick was never told, after the visit at the doorway, whether he was under arrest or whether he still possessed the ability to terminate the interview. The officers made no pretense of having any kind of warrant or any kind of process that would allow them to insist on remaining in the apartment or continuing the interview. The entire interview perhaps did not take more than thirty minutes or so, and then the police were gone with the seized computer.

The evidence was that Quick was cooperative throughout. Detective Sullivan and Detective Perkins both said Quick freely invited them into his apartment. The officers were apparently courteous and respectful throughout. Quick did not ask them to leave, and there is no indication that he was treated as though he were under arrest.

Quick, in his brief, makes much of the fact that he mentioned to the detectives that he was getting ready to go to work at the time they appeared at his apartment. Quick wishes for us to believe that the officers essentially refused to allow him to go to work. Had that notion been reflected in the record, it would, in our view, be a significant part of the analysis. The record fails to substantiate that allegation. Detective Perkins remembered that it was just after Quick invited them into the apartment that Quick said he was "getting ready for work" and that Quick "explained and talked about how he rides his bike to work." Detective Sullivan testified on cross-examination that he did "not remember any comments about *needing* to be at work." (Emphasis added.) Detective Sullivan said Quick was very cooperative.

On cross-examination of her testimony, Detective Perkins said that she remembered Quick saying he was "going to go to work." When asked if she had instructed Quick to call work and say that he would be late, Detective Perkins testified as follows: "Q: And you told him that he needed to call the work and tell them that he needed to be late today? A: I don't say—I wouldn't say I told him to. I said if he needed to." The defense counsel then asked if Mr. Quick asked "permission to leave," and the witness answered: "I don't recall that." The defense counsel then stated that he had no further questions.

On redirect examination, Detective Perkins testified as follows:

Q. Can you please explain to the best of your recollection how the issue of going to work came up?

A. Well, when we went to the door, he had mentioned that he was just getting ready for work. And when we went in and we were discussing—I don't recall what time he had to be at work. I don't recall exactly what words were said between the two of us, but if he had to call, I wasn't—I didn't say that he couldn't call or that he should call.

Q. ... Did you tell him he couldn't go to work?

A. No

Q. Did you tell him that he had to stay—stay there and let you stay inside his apartment?

A. No.

Q. In fact, he told you about getting ready to go to work before he even invited you inside?

A. That's right.

Q. When you had that discussion with him, did he say, "You know what, I'm—I've got to go to work. You have to leave."?

A. He never said that.

Q. Did you tell him you weren't leaving?

A. No.

The testimony shows that the detectives knew that Quick was planning shortly to go to work but that he did not specify that he *needed* to leave for work or was insisting on leaving for work. It is true that the officers evidently did not specifically offer to come back later. The officers did not specify that he could not leave, nor did they tell him whether he should or should not call his employer. There was no testimony that he *did* call his work or that he asked whether the officers would mind if he called his work. There was no evidence that the interview was of such length that it created concern about Quick's need to get to his job. There was no evidence as to what time Quick was supposed to be at work or as to what time he got there that day. Although the officers were aware (due to Quick's remark) that Quick was getting ready to go to work, there was no evidence that the officers intentionally restrained him from going to work or sought to purposely interfere with his work schedule or otherwise restrict his movement. The record does not show that he asked the officers to leave his apartment or asked for permission to terminate the interview so that he could leave to go to work.

There might be things that Quick would wish were in the record but are not there. The key thing, though, is not what the officers intended or what Quick subjectively thought, but rather whether, based on the record *we do have*, the trial court reasonably concluded that a reasonable person in the totality of the circumstances would have believed that he was subject to the functional equivalent of being under formal arrest.

 Quick is correct that he was a suspect. Regardless of how one might wish to define the word "suspect," the fact is that the police would not even have been knocking on Quick's door if they did not suspect something. However, whether the person being interviewed is technically considered a suspect, or a possible suspect, is not the pertinent inquiry; the question is whether the person is in custody. *See Brooks*, 185 S.W.3d at 277.

Quick emphasizes the fact that his living room was not large, suggesting that the lack of larger size made the police more intimidating. The testimony of the officers makes it uncertain how small or large the living room was. But even assuming the room was small, we fail to see that the size of the room has a great deal to do with it. It was the only living room Quick had. He presumably had nowhere else to invite the officers into. We cannot say that the size of the room would have had anything to do with his sense that he was under formal arrest. The question is still whether Quick was subject to arrest-like restraints. *Id.* In *State v. Hill*, the interview room at the police department, to which department the defendant voluntarily came, was approximately eight by ten feet and had no outside windows. 247 S.W.3d at 43. The court did not conclude that the defendant in *Hill* was "in custody."

Sometimes an interview can start as simply an investigative interview, and then at some point be transformed into an in-custody interview. In *Brooks*, the officer in question was investigating the cause of an infant's sudden death by talking to the babysitter. 185 S.W.3d at 268. It started out as an entirely voluntary, typical inves-

tigative interview. The officer continued interrogating, taking the interview through various stages that became gradually more confrontational. At one critical point, the babysitter said she wanted to leave, and the officer made clear that the babysitter *could not leave* until the officer was through questioning. Shortly thereafter, the babysitter admitted pressing a blanket to the child's face to get her to stop crying. Then, and only then, did the police officer inform the babysitter of her *Miranda* rights; then the officer proceeded to formalize the confession. *Id.* at 271. This court held that the *Miranda* warnings came too late, because there was a custodial interrogation as soon as it became clear that the officer would not let her leave upon request. A reasonable person at that point would have believed that her freedom was being restrained by the officer, so that she was for all practical purposes "in custody." *Id.* at 282.

This case differs from *Brooks*. There is no indication here that the investigative interview was at any particular point transformed into an in-custody interview. Quick mentioned right away, in inviting the officers in, that he was getting ready to go to work soon but still said that it would be "fine" for the officers to come in. The record fails to show that any factor or human dynamic was introduced after that to change the nature of the interview. The officers never said, as occurred in *Brooks* in response to Ms. Brooks plea to quit the interview, something like "we will let you go *after* we have some answers to some more questions." There also is no evidence that the subject of Quick's job was ever brought up again.

The issue is what a reasonable person would have thought about the degree of his freedom to ask the officers to leave. It is not about whether it would have been awkward to ask the officers to leave, or

whether it would have tended to increase suspicion of guilt by asking them to leave, or whether it might have seemed impractical in some other way. The issue is not even whether it is an intimidating thing to be interviewed by police. Of course it is intimidating, *Mathiason*, 429 U.S. at 495, 97 S.Ct. 711, but the issue is whether a reasonable person in those circumstances would have believed that he had in fact lost his freedom to insist that the interview was over so he could leave and go to work. The issue, in other words, is whether a reasonable person would have believed that the officers were going to insist on restraining him from going to work until they were through.

The record does not say how long the interview lasted. One of the questions of the defense counsel suggested that the entire interview was perhaps only fifteen to thirty minutes or so, and then the police were gone. The evidence does not show that the police were a dominating presence, throwing their authority around, giving orders to Quick, and making threats. The evidence tends to suggest a typical, courteous police interview in someone's living room. The officers were armed, but there was no evidence that any weapons were visible. The mere showing of a badge by a plain-clothes detective for identification purposes (assuming that was done) obviously does not constitute an arrest or detention.

Quick essentially suggests that the trial court should have believed, based on his viewing of the officer's testimony, that the officers were not honest and forthcoming about the interview and that they actually *had* restricted Quick's liberty so that he was in custody. Perhaps the trial court *could* have found that. We need not decide that. But the trial court had factors, circumstances, and testimony from which the court could and did reasonably con-

clude that this was not a custodial interrogation. The evidence is consistent with the notion that Quick, though planning to leave before long, chose to stay and voluntarily cooperate with the interview until the officers left and, thus, was not in custody.

■ Once the detectives confirmed with Quick that they had his IP address, Quick may have anticipated that the detectives already had information that placed him in jeopardy of prosecution. It is thus a possible and reasonable assumption that he strategically chose to adopt a posture of cooperation, believing that such a posture might help lessen any repercussions of the investigation. When a suspect chooses voluntary cooperation as a strategy, there is no coercion and no custodial interrogation until the investigating officer begins to restrict the freedom of the suspect. *See Brooks*, 185 S.W.3d at 282.

The trial court did not misapply the law, and we cannot say that the trial court's ruling was unsupported in the evidence or was clearly erroneous. The point is denied.

### Point III

Quick claims the trial court erred in instructing the jury to find him guilty if they found that he was "aware" of the content and character of the videos found on his computer. He says "aware" requires a lesser showing of proof than what was required by the statutes under which he was charged. Quick maintains that sections 573.025 and 573.037, in effect between August 2, 2007, and December 3, 2007, required that a person must "know" of the character and content of the alleged child pornography.

■ Whether the jury was properly instructed is a question of law that this court reviews *de novo*. *State v. Richards*, 300 S.W.3d 279, 281 (Mo.App.2009). A faulty instruction is grounds for reversal if the defendant was prejudiced. *Id.* "Whenever there is an MAI–CR instruction applicable under the law, the MAI–CR instruction is to be given to the exclusion of any other instruction." *State v. Anderson*, 306 S.W.3d 529, 534 (Mo. banc 2010). The only exception to this rule is where the approved instruction conflicts with the substantive law. *State v. Miller*, 172 S.W.3d 838, 851 (Mo.App.2005).

■ Both crimes with which Quick was charged required a finding that Quick acted regarding the child pornography "knowing of its content and character." *See* sections 573.025 & 573.037. Both verdict directors submitted this element by requiring a finding that "defendant at the time was aware of the content and character of the material." Both verdict directors were patterned after approved instructions, which permitted the State to elect the language "was aware" to submit the knowing mental state. *See* MAI–CR 3d 327.12, Notes on Use 4 (2005); MAI–CR 3d 327.16, Notes on Use 6 (2005). Thus, the instructions conformed to the approved pattern instructions.

Quick claims that the verdict directors conflicted with the law because they required a finding that he acted with "awareness" instead of knowledge, which he claims "is a lower standard of proof than is required by statute." Despite Quick's assertion to the contrary, we find no indication that any alleged difference between the two terms carries legal significance. Section 562.016 states that a person acts knowingly or with knowledge "[w]ith respect to his conduct or to attendant circumstances *when he is aware* of the nature of his conduct or that those circumstances exist." *See* section 562.016.3. The Notes on Use to each of the pattern instructions state: "There is no legal difference be-

tween 'knew' and 'was aware.'" *See* MAI–CR 3d 327.12, Notes on Use 4 (2005); MAI–CR 3d 327.16, Notes on Use 6 (2005). The statutes attribute the knowing mental state to "the content and character" of the child pornography, making them the "attendant circumstances" to his conduct of promoting and possessing the pornography. *See* sections 573.025 & 573.037.

In practical terms, to be "aware" of the content and character of a video or a photograph is to "know" the content and character. While in some specialized contexts, there might be a difference between the two terms, in ordinary language they are the same. Both "knowing" and "awareness" involve cognition of a circumstance, a concept, or a category. The question here was surely understood by the jury as asking them to decide whether Quick was aware (had cognition) of the character and content of the videos. To find Quick guilty, the jury did not need to find that he was fully informed of all the details. The ignominious titles of the files, especially Exhibit 16, certainly created a sense of the nature of the images one would be likely to find on the files. The slightest viewing of each video would quickly confirm the character and content of the files.

The jury could have believed beyond a reasonable doubt that, as Quick told the officers, he had downloaded several files of child pornography "out of curiosity." The jury could have believed that his curiosity also drove him to view those files. The jury was not required to believe his remark to the officers that he destroyed the files he had downloaded. In any event, Quick does not contend that the evidence was insufficient to support the verdict. He contends only that there was error in the language submitting the cognitive state necessary for conviction. We hold that the verdict directors requiring a finding that Quick "was aware" of the content and

character of the child pornography conformed with the substantive law and properly submitted the *mens rea* for the crimes.

The point is denied.

### Conclusion

The judgment is affirmed.

All concur.