Missouri SOYBEAN MERCHANDISING COUNCIL, et al., Appellant-Respondents,

v.

AGBORN GENETICS, LLC., Respondent-Appellant.

WD 79901 CONS WD 79945

Missouri Court of Appeals, Western District.

OPINION FILED: JUNE 27, 2017

Todd Rowden, Chicago, IL, Counsel for Appellant-Respondents.

Randall D. Grady, Saint Louis, MO, Counsel for Respondent-Appellant.

Before Division Three: Anthony Rex Gabbert, Presiding Judge, Victor Howard, Judge, Cynthia L. Martin, Judge

Anthony Rex Gabbert, Judge

## Introduction

AgBorn Genetics, LLC. (AgBorn) appeals from the judgment entered by the Circuit Court of Jackson County, Missouri, following a jury verdict in favor of Missouri Soybean Merchandising Council (Missouri Soybean) and Mid-America Research and Development Foundation (Mid-America Research) (collectively, "Plaintiffs") on Count IX of Plaintiffs' Amended Petition for unjust enrichment. AgBorn raises five points on appeal. AgBorn contends that: 1) The trial court erred in granting Plaintiffs' Motion for Partial Summary Judgment and denying AgBorn's Motion for Partial Summary Judgment as to Count VIII of the Amended Petition, because the undisputed material facts established that there was a meeting of the minds and an enforceable contract where Plaintiffs had received a schedule identifying licensed technology and royalty rates and subsequently accepted royalty payments from AgBorn; 2) The trial court erred in granting Plaintiffs' Motion for Partial Summary Judgment as to Count VII of the Amended Petition because there was a genuine dispute as to material facts, in that a schedule was attached to the Master Commercialization Agreement and the Master Commercialization Agreement was intended to grant AgBorn rights in the Licensed Technology for so long as the Plaintiffs' retained those rights; 3) The trial court erred in granting Plaintiffs' Motion for Partial Summary Judgment as to Count X [1] of the Amended Petition, because Missouri implies a standard of reasonableness when setting a price is impracticable at the time the contract is executed, and there was evidence that doing so was impracticable at the

1. Although AgBorn's brief references Count XI, it appears that AgBorn intends to reference Count X of the Amended Petition as Count XI involved a separate issue and was voluntarily dismissed by Plaintiff's after trial.

time the SA was executed; 4) The trial court abused its discretion in denying Ag-Born's Motion for Leave to File a Counterclaim because leave to amend is to be freely granted and the factual basis of the Counterclaim was only recently discovered and the trial court had erroneously entered summary judgment against AgBorn, and; 5) The trial court abused its discretion in entering sanctions against AgBorn because Plaintiffs could not have been prejudiced by incurring attorney fees for third-party discovery when the third-parties were in possession of documents that were not in AgBorn's possession.

Plaintiffs raise one point on cross-appeal. Plaintiffs contend that the trial court erred in partially denying summary judgment to Plaintiffs on Count VIII arguing that the Master Commercialization Agreement was unenforceable since its inception. We affirm.

## Factual Background

This case involves two written instruments concerning the commercialization of certain technologies related to soybean production. Missouri Soybean is a not-for-profit organization representing Missouri soybean farmers; Mid-America Research is a not-for-profit organization which is affiliated with Missouri Soybean and supports research related to soybean production and use. AgBorn is in the business of selling soybean. In June of 2008, Plaintiffs and AgBorn signed a document titled "Master Commercialization Agreement."[2] This document states that Plaintiffs had contracted for limited exclusive technology licenses, commercialization rights, and ac-

cess to trade secrets, and that Plaintiffs were giving AgBorn an exclusive sublicense for the development, manufacture, use, distribution, marketing, and sale of the technologies. In exchange, AgBorn was to use reasonable efforts to promote the sale of the licensed technology and was to pay Missouri Soybean a royalty on the collected gross sales of all products or methods covered by the licensed technology.

On December 30, 2011, Missouri Soybean and AgBorn (Mid-America Research was not a party) signed a document titled "Sublicense Agreement."[3] This document provides that the University of Missouri and the United States Department of Agriculture jointly owned inventions regarding the development of High Oleic Acid Soybeans and that the University of Missouri had an exclusive worldwide license for those inventions, with the right to grant sublicenses to qualified commercial partners. Pursuant to that right, the University of Missouri exclusively sublicensed to Missouri Soybean all the rights granted to the university. The Sublicense Agreement provides that Missouri Soybean was sublicensing to AgBorn all rights it had been granted by the university due to AgBorn's willingness "to invest capital for the further development and testing of the inventions to bring them to commercial use for the benefit of potential users at the earliest practical date." In exchange for the exclusive sublicense, AgBorn was to pay Missouri Soybean a percentage of collected gross sales. A similar Sublicense Agreement was signed on August 1, 2013, and

---

**2.** AgBorn states in its appeal brief that, while the attorneys who drafted the Master Commercialization Agreement represented AgBorn in other matters, AgBorn consented to those attorneys representing Plaintiffs in the drafting of the Master Commercialization Agreement.

**3.** The Sublicense Agreement was drafted by the same attorneys who drafted the Master Commercialization Agreement.

purported to be effective the same date as the prior Sublicense Agreement.[4]

On May 23, 2014, Plaintiffs filed a petition against AgBorn. Plaintiffs filed an amended petition on September 11, 2014.[5] As relevant to AgBorn's claims on appeal, and set forth herein in the order raised by AgBorn, Plaintiffs alleged in Count VIII of the Amended Petition that the Master Commercialization Agreement was unenforceable because it failed to incorporate two material terms of the purported agreement, the identity of the licensed properties and the royalty rates payable to Missouri Soybean, resulting in there never being a meeting of the minds on all essential terms. Plaintiffs alleged in Count VII of the Amended Petition that the Master Commercialization Agreement was terminable at will for having no definite duration or termination provision. Plaintiffs' Amended Petition alleged in Count X that the Sublicense Agreement was unenforceable because it failed to incorporate the royalty rates payable to Missouri Soybean and, consequently, there was no meeting of the minds regarding all essential terms of the Sublicense Agreement.

On February 12, 2017, Plaintiffs filed a Motion for Partial Summary Judgment on Counts VII, VIII, and X of the Amended Petition. That same date, AgBorn filed a Motion for Partial Summary Judgment as to Count VIII. On May 10, 2016, AgBorn filed a motion for leave to file a counterclaim. On May 20, 2016, the trial court entered a Judgment/Order granting Plaintiffs' Motion, denying AgBorn's Motion for Partial Summary Judgment, and denying AgBorn's request to amend its answer to include a counterclaim. An Amended Judgment and Order was entered on June 6, 2016, which was nearly identical to the court's previous order but clarified that the court was denying any requests to make its summary judgment rulings retroactive in nature. On June 8, 2016, the court granted in part and denied in part Plaintiffs' motion for sanctions against AgBorn; the court sanctioned AgBorn $59,167.61 which represented attorneys' fees incurred by Plaintiffs due to AgBorn's discovery abuses. A jury trial was then conducted solely on Plaintiffs' unjust enrichment claim in Count IX which alleged that AgBorn had accepted and retained the benefit of being granted the right to commercialize the intellectual property belonging to Plaintiffs and had failed to make royalty payments or otherwise fairly compensate Plaintiffs. Trial was held from June 13, 2016, through June 15, 2016. The jury returned a verdict in Plaintiffs' favor in the amount of $602,945.00. On July 27, 2016, an Amended Judgment responding to Plaintiffs' Motion for Interest was issued. AgBorn appeals and Plaintiffs cross-appeal.

## AgBorn's Point I

In AgBorn's first point on appeal, AgBorn contends that the trial court erred in granting Plaintiffs' Motion for Partial Summary Judgment and denying AgBorn's Motion for Partial Summary Judgment as to Count VIII of the Amended Petition, because the undisputed material facts established that there was a meeting of the minds and an enforceable contract

4. The initial Sublicense Agreement was revised at the request of the United States Department of Agriculture.

5. Count II of that amended petition, which sought injunctive relief related to the Master Commercialization Agreement, was dismissed without prejudice; Count IV, for restitution, was dismissed with prejudice in initial motion practice over Missouri Soybean's opposition. The remaining counts of the petition were adjudicated, though only counts VII, VIII, and X are relevant to the issues on appeal.

where Plaintiffs had received a schedule identifying licensed technology and royalty rates and subsequently accepted royalty payments from AgBorn, which either entitled AgBorn to summary judgment, or, in the alternative, precluded summary judgment against AgBorn.

We review the grant of a summary judgment *de novo. Brehm v. Bacon Tp.*, 426 S.W.3d 1, 3 (Mo. banc 2014). We consider the record in the light most favorable to the party against whom judgment was entered and give the non-moving party the benefit of all reasonable inferences. *Id.* at 3-4. Summary judgment is appropriate where there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. *Allen v. Continental Western Ins. Co.*, 436 S.W.3d 548, 551-552 (Mo. banc 2014). A material fact in the summary judgment context is one from which the right to judgment flows. *Id.* at 552.

Plaintiffs' Amended Petition alleged in Count VIII that the Master Commercialization Agreement was unenforceable because it failed to incorporate two material terms of the purported agreement—the identity of the licensed properties and the royalty rates payable to Missouri Soybean—resulting in there never being a meeting of the minds on all essential terms. The trial court agreed and granted summary judgment to Plaintiffs. AgBorn contends on appeal that subsequent documents and Plaintiffs' acceptance of royalties filled in the missing material terms of the agreement. We disagree.

In short, the Master Commercialization Agreement was designed to grant AgBorn the right to commercialize specific technologies held by Plaintiffs in exchange for royalty payments. The Master Commercialization Agreement indicates that Plaintiffs had contracted for limited exclusive technology licenses, commercialization rights, and access to trade secrets, "all of which summarized in Schedule A which is attached hereto and made part of this Agreement." The license agreements and commercialization rights set forth in Schedule A were to be collectively referred to as "Licensed Technology." The Master Commercialization Agreement provides that, "[a]s the parties expect changes in the number of limited exclusive technology licenses and commercialization rights during the term of this Agreement they agree to amend Schedule A at reasonable intervals but not less than biannually during the term of this Agreement." According to the agreement, any variations, modifications, or alterations of the Master Commercialization Agreement required a writing signed by each party. The agreement provided that it could be executed in counterparts which, when taken together would constitute an original of the agreement. If executed in counterparts, the parties were to promptly circulate a copy to be signed by all parties.

The Master Commercialization Agreement further provides that Plaintiffs were giving AgBorn an exclusive sublicense for the development, manufacture, use, distribution, marketing, and sale of the Licensed Technology set forth in Schedule A. In exchange for those rights, AgBorn was to use reasonable efforts to promote the sale of the licensed technology and was to pay Missouri Soybean a royalty on the collected gross sales of all products or methods covered by the Licensed Technology. The royalty rates were to be "dependent on the specific technology according to classification as attached in Exhibit B which is hereby unincorporated [6] by reference and made part of this Agreement."

---

6. The Master Commercialization Agreement states "unincorporated"; it is likely this was a

All parties acknowledge that neither a Schedule A, nor an Exhibit B, were attached to the Master Commercialization Agreement at the time of its inception. There were documents existing at the time of the agreement labeled "SCHEDULE A" and "EXHIBIT B," however neither of these were attached to the Master Commercialization Agreement and neither included the information that the Master Commercialization Agreement specified that these documents were to include. The document titled SCHEDULE A includes the words, "(TABLE OF LICENSED PROPERTIES)," but is otherwise blank. The document titled EXHIBIT B includes the words, "(Royalty rate by classification)," but lists no royalty rates. EXHIBIT B further lists different hypothetical options that could be used to establish royalty rates for "Varieties," "Traits," and "Molecular engineering."

▪▪▪ "Under Missouri law, the essential elements of a contract are: (1) competency of the parties to contract; (2) subject matter; (3) legal consideration; (4) mutuality of agreement; and (5) mutuality of obligation." *Building Erection Services Co. v. Plastic Sales & Mfg. Co., Inc.*, 163 S.W.3d 472, 477 (Mo. App. 2005). At issue here is the fourth element, mutuality of agreement. This requires that the parties have " 'a mutuality of assent or a meeting of the minds on the essential terms of a contract.' " *Id.* (quoting *Ketcherside v. McLane*, 118 S.W.3d 631, 635 (Mo. App. 2003)). Whether there was a meeting of the minds is a fact question for the trier of fact. *Tom's Agspray, LLC v. Cole*, 308 S.W.3d 255, 259 (Mo. App. 2010). Here, however, both parties agreed that the ma-

terial facts were not in dispute and presented the trial court with competing summary judgment motions.[7] Plaintiffs contended that the Master Commercialization Agreement was ineffective because the identity of the licensed properties and the royalty rates payable to Missouri Soybean were missing from the June 2008 agreement. Agborn contended that the licensed properties and royalty rates were later incorporated into the Master Commercialization Agreement by an unsigned July 2013 document titled "Licensed Properties" and by Plaintiffs' deposits beginning in 2011 of royalty checks reflecting those rates.

We find that the July 2013 "Licensed Properties" document did not amend the Master Commercialization Agreement such that it supplied it with the missing material terms. Aside from the fact that the "Licensed Properties" document is not titled "Schedule A" or "Exhibit B," it is unsigned and, therefore, could not be considered an amendment to Schedule A or Exhibit B as both were to be incorporated into the Master Commercialization Agreement and any modification of that agreement requires a writing signed by each party. The "Licensed Properties" document could not be considered a "counterpart" of the Master Commercialization Agreement for the same reason. Consequently, the Master Commercialization Agreement fails to identify the licensed technology covered by the agreement and the royalty rates associated with that licensed technology. Without these material terms, the Master Commercialization

---

clerical error due to "unincorporated" being inconsistent with "attached" and "made part of this Agreement."

7. Consequently, we will not address AgBorn's argument on appeal that, "[a]t a bare mini-

mum, the record before the trial court created a genuine dispute of material facts as to whether or not the Master Commercialization Agreement was enforceable."

Agreement is unenforceable. There can be no agreement on non-existent terms.

We disagree with AgBorn's contention that, because the July 2013 "Licensed Properties" document lists licensed properties and royalty rates consistent with checks that AgBorn issued beginning in November of 2011 and that Plaintiffs cashed, "[t]his is objective evidence of a binding and enforceable contract between the parties." In essence, AgBorn contends that because it began paying some royalties in 2011 based on AgBorn's unilateral pronouncement of royalty rates, and Plaintiffs accepted these payments, Plaintiffs contractually agreed to AgBorn's selected royalty rates; further, because Plaintiffs cashed two checks after AgBorn created the "Licensed Properties" document in 2013, the "Licensed Properties" document became part of the Master Commercialization Agreement. This cannot be. The plain language of the Master Commercialization Agreement requires all parts of that agreement, including modifications, to be mutually agreed upon in writing.

Neither party disputes that AgBorn used and sold products from technologies provided by Plaintiffs. While the parties may dispute the applicable legal theory governing compensation to Plaintiffs, neither party disputes that Plaintiffs were entitled to compensation.[8] Given the Master Commercialization Agreement's unambiguous requirement that material terms be incorporated into the agreement in a specified manner, Plaintiffs' acceptance of checks from AgBorn evidences nothing more than an acknowledgement that Plaintiffs were entitled to compensation; it does not supply the Master Commercialization Agreement with terms establishing the amount to which Plaintiffs were entitled.[9] The circuit court did not err in finding the Master Commercialization Agreement unenforceable and granting partial summary judgment to Plaintiffs on Count VIII. Point one is denied.

## AgBorn's Point II

■ In AgBorn's second point on appeal, AgBorn contends that the circuit court erred in granting Plaintiffs' Motion for Partial Summary Judgment as to Count VII in the Amended Petition, because there was a genuine dispute as to material facts, in that a schedule was attached to the Master Commercialization Agreement and the Master Commercialization Agreement was intended to grant AgBorn rights in the Licensed Technology for so long as Plaintiffs retained those rights.

Count VII of Plaintiffs' Amended Petition sought a declaratory judgment that the Master Commercialization Agreement, if an enforceable contract, was terminable at will. Because we determined in AgBorn's first point on appeal that the Master Commercialization Agreement was unenforceable, we need not reach this issue and decline to review this point on appeal.

8. To this end, we note that the court did not grant Plaintiffs' request for summary judgment on the issue of retrospective enforceability of the Master Commercialization Agreement. Agborn was entitled to argue applicability of the MCA when Plaintiffs presented their unjust enrichment claim to the jury. Neither party has appealed the jury verdict on that claim. Consequently, any attempt to disrupt that jury verdict via the claims in this appeal would represent an impermissible collateral attack on that verdict.

9. While nothing precluded AgBorn from introducing the "Licensed Properties" document and receipt of payment as evidence against Plaintiffs' unjust enrichment claim, the document simply does not supply the Master Commercialization Agreement with its missing material terms.

## AgBorn's Point III

In AgBorn's third point on appeal, AgBorn contends that the circuit court erred in granting Plaintiffs' Motion for Partial Summary Judgment as to Count X of the Amended Petition because Missouri implies a standard of reasonableness when setting a price at the time of execution is impracticable, and there was evidence that doing so was impracticable at the time the Sublicense Agreement was executed.

The Sublicense Agreement, like the Master Commercialization Agreement, was designed to grant AgBorn the right to commercialize specific technologies held by Missouri Soybean (Mid-America Research was not a party) in exchange for royalty payments. Unlike the Master Commercialization Agreement, the Sublicense Agreement specifically identifies the technologies covered by the agreement by patent application serial numbers and other identifiers. With regard to the royalty rates, however, the Sublicense Agreement states: "In consideration for the sublicense granted to it hereunder, LICENSEE will pay to MSMC commencing from the date of the first sale or invoice, whichever comes first, of Licensed Product, the percentage of Collected Gross Sales set forth on Schedule A (the 'Royalty')." There were two versions of this agreement, one dated December 31, 2011, and one dated August 1, 2013. Both purport to be "effective as of December 30, 2011." The December 31, 2011, version of the Sublicense Agreement contains an attached document labeled "SCHEDULE A," but is otherwise blank except for the phrase "Royalty Rate." The August 1, 2013, version of the Sublicense Agreement contains no Schedule A.

AgBorn does not dispute that royalty rates are not included in the Sublicense Agreement. AgBorn contends that, because "setting a price" at the time of the execution of the Sublicense Agreement was impracticable, the Sublicense Agreement is enforceable because we must presume that the parties intended "a standard of reasonableness" to apply. AgBorn discusses that Plaintiffs' former Executive Director and CEO, Dale Ludwig, testified about why royalty rates were not included in the Sublicense Agreement. He testified that both Pioneer and Monsanto had competing high oleic technology and, due to the progress made in the technologies, Monsanto and Pioneer were going to beat Plaintiffs' technology to the market. AgBorn contends that, at the time the Sublicense Agreement was executed, because it was apparent that competing technology would reach the marketplace first and clarify the value of the technology, it was impractical and possibly disadvantageous to Plaintiffs to fix the price at the time of the contract. Ludwig testified that, to address the royalty rate later on, one way would be to compare the high oleic soybean oil to the sales price of the competing canola or sunflower oils; otherwise Monsanto or Pioneer's pricing could be compared.

We cannot ignore the plain language of the Sublicense Agreement which makes no reference to an impracticability in "setting a price" at the time the document was drafted but, rather, states that the royalty rates are "set forth on Schedule A." All parties acknowledge that no royalty rates are set forth on the attached SCHEDULE A. Significantly, although AgBorn focuses on the inability to determine the market price of the high oleic soybean product at the time of the agreement and advocates that the agreement is nevertheless effective because Missouri law allows for courts to impute a "reasonable" price in some instances (citing the Uniform Commercial Code for the sale of goods), AgBorn ignores that this agreement was not to establish a price for AgBorn's product but

was to establish Missouri Soybean's royalty percentage of AgBorn's collected gross sales on that product. Hence, even if a "reasonable" sales price for the end soybean product could be ascertainable by a court, the "reasonable" percentage of collected gross sales that Missouri Soybean would be entitled to is much more case specific and clearly something that the parties needed to reach an agreement on. Royalty rates are affected by several criteria.[10] These criteria include whether the licensing is exclusive or non-exclusive, whether upfront sums are paid, industry standard royalty rates, company standard rates, how far along the intellectual property is to commercialization, the market potential of the idea, whether the intellectual property is packaged with other intellectual property, and if the intellectual property requires testing or certification prior to being brought to market. *Id.* Factors contributing to higher royalty rates and the ability to require upfront idea licensing fees include high tech invention ideas, inventions that solve costly problems, inventions that provide large benefits, inventions that have already met industry testing requirements, inventions that have already met industry certification requirements, commitments for purchase orders, existing sales, and lack of suitable substitute products/technology. *Id.* Clearly, these are all considerations for the contracting parties; what is "reasonable" in the context of royalties are best ascertained by each party reflecting upon its own circumstances and determining the

benefit that will be gained by the bargain.[11]

"[T]he terms of agreement must be sufficiently definite to enable the court to give it an exact meaning." *Bldg. Erection Servs. Co.*, 163 S.W.3d at 477. Here, the terms are not definite; the terms indicate that the parties had agreed upon royalty rates which were attached to the agreement. The royalty rates were not attached. Because the Sublicense Agreement denotes the parties' intent to establish royalty rates at the time the Sublicense Agreement was entered and include the royalty rates within the Sublicense Agreement, the agreement evinces no meeting of the minds regarding this essential term. AgBorn's suggestion on appeal that the parties intended to leave the royalty rate open to further research is not reflected in the plain language of the agreement. The circuit court did not err in granting Plaintiffs' Motion for Partial Summary Judgment as to Plaintiffs' claim that the Sublicense Agreement was unenforceable because it failed to incorporate the royalty rates payable to Missouri Soybean and, consequently, there was no meeting of the minds regarding all essential terms of the Sublicense Agreement. Point three is denied.

### AgBorn's Point IV

In AgBorn's fourth point on appeal, Agborn contends that the trial court abused its discretion in denying AgBorn's Motion for Leave to File a Counterclaim because leave to amend is to be freely

10. Patent Licensing Guide: Ultimate Guide to Invention Royalty Rates, http://www.idea buyer.com/news/royalty-rates/; July 1, 2014.

11. EXHIBIT B, discussed above regarding the Master Commercialization Agreement, further evidences this. The document discusses ways in which royalties might be determined and evidences how case specific royalty rates are, even once a particular type of product is

identified. For example, it suggests that royalties for products involving "Molecular engineering" might be "[p]ayable as an up-front technology access fee, plus milestones through product development or regulatory approval, plus either a fixed percentage of sales or a flat rate per royalty basis unit, which may be a weight or count of seeds."

granted and the factual basis of the counterclaim was only recently discovered and the trial court erroneously entered summary judgment against AgBorn.

 "As a general rule, amendments to pleadings should be liberally allowed[;]" however, "[a]llowing amendments to pleadings is within the sound discretion of the trial court." *Asmus v. Capital Region Family Practice*, 115 S.W.3d 427, 432 (Mo. App. 2003). "Review of a trial court's denial of a motion to amend the pleadings is for an abuse of discretion." *Id.*

 AgBorn's counterclaim hinged on the enforceability of the Master Commercialization Agreement and the Sublicense Agreement as it alleged that Plaintiffs had breached their obligations under those contracts. The trial court denied AgBorn's motion for leave to file its counterclaim after determining that the Master Commercialization Agreement and Sublicense Agreement were unenforceable. As we agree that the Master Commercialization Agreement and Sublicense Agreement are unenforceable, we find no abuse of discretion in the court's denial of AgBorn's motion to file a counterclaim for breach of those agreements. "[I]n order to state a cause of action for breach, the party must show the 'existence of a valid and enforceable contract between the parties.' " *Reynolds v. Reynolds*, 109 S.W.3d 258, 279 (Mo. App. 2003) (quoting *In re Marriage of Gibson*, 77 S.W.3d 641, 644 (Mo. App. 2002)). Point four is denied.

## AgBorn's Point V

 In AgBorn's fifth point on appeal, AgBorn contends that the trial court abused its discretion in entering sanctions against AgBorn because Plaintiffs could not have been prejudiced by incurring attorney fees for third-party discovery when the third parties were in possession of documents that were not in AgBorn's possession, custody or control, and because it included fees incurred by Plaintiffs' counsel not related to discovery practice.

 A circuit court has broad discretion in imposing sanctions for discovery violations. *Lewellen v. Franklin*, 441 S.W.3d 136, 149 (Mo. banc 2014). A court abuses its discretion only when the court's ruling is "clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *State v. Johnson*, 207 S.W.3d 24, 40 (Mo. banc 2006). "If reasonable persons may differ as to the propriety of an action taken by the trial court, then there was no abuse of discretion." *State v. Quick*, 334 S.W.3d 603, 609 (Mo. App. 2011) (citing *State v. Reed*, 282 S.W.3d 835, 837 (Mo. banc 2009)).

In sanctioning AgBorn, the trial court found there to be "innumerable issues that were the subject of discovery." The court found that AgBorn failed to produce responsive documents as ordered by the court and failed to provide adequate responses to the discovery. The court also found "issues concerning a central witness in the case, Alex Stemme." Alex Stemme was AgBorn's General Manager, Owner, and Corporate Representative and, after Stemme refused to answer certain questions in a deposition, the court had to order Stemme to sit for a second deposition. The court granted extensions to AgBorn to produce responsive documents and AgBorn still failed to produce certain documents. The court found that, because AgBorn failed to produce certain documents, the Plaintiffs were forced to seek discovery from numerous third-party entities and incur expenses that would not have been necessary had AgBorn produced the documents. Some of these documents included royalty reporting forms which could be

used to help determine damages. The court found that AgBorn asserted to the court that there were only three contracts with seed companies in existence causing the court to deny Plaintiff's Fifth Motion to Compel as moot; it was later determined that additional contracts should have been provided by AgBorn and AgBorn gave no rational explanation for failing to identify or produce the contracts. Plaintiffs were forced to obtain this information from third parties. The court found that AgBorn averred to the court that only certain emails of Alex Stemme were in existence; Plaintiffs discovered through third-party entities numerous emails from and to Stemme and others associated with AgBorn that directly concerned royalty payments and sales of seed. The court ultimately concluded that AgBorn "has abused the discovery process and violated the Orders of the Court." The court found Plaintiffs "prejudiced in their efforts to do discovery; appear before the Court, take depositions, and communicate with counsel.". The court found that "the discovery violations were so substantial so as to afford that the Defendant should be sanctioned for its actions in this case." The court did not award all fees and expenses Plaintiffs requested, but did award fees "from the point where Plaintiff was required to seek Sanctions, again seek discovery in its Fifth Motion to Enforce, and the time Plaintiffs were required to spend in obtaining the discovery it should have from the Defendant."

▬ AgBorn argues on appeal that the documents that Plaintiffs ultimately recovered from third parties were not in AgBorn's possession, custody or control, and therefore could not have been produced by AgBorn. AgBorn suggests that this is proven by the fact that third party entities ultimately produced the information. We find no abuse of discretion. While AgBorn primarily focuses on various emails that were recovered from personal email accounts of former AgBorn employees and indicates that AgBorn had no access to those personal email accounts, AgBorn does little to address why royalty reports and third party contracts with entities that sold Plaintiff's seed were not provided to Plaintiffs. AgBorn would have undoubtedly been privy to this information even if third-party entities also held copies of the documentation. Plaintiffs were prejudiced by having to expend time and resources on obtaining information that AgBorn could and should have provided. AgBorn fails to prove that the court's sanctions were clearly against the logic of the circumstances and so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. To the contrary, the court's detailed account of AgBorn's discovery abuses and subsequent articulation of the chosen sanctions evinces caution as well as careful consideration.[12] Point five is denied.

### Plaintiffs' Point on Cross-Appeal

▬ In Plaintiffs' sole point on cross-appeal, Plaintiffs contend that the trial court erred in partially denying summary judgment to Plaintiffs on Count VIII because the Master Commercialization Agreement was unenforceable since its inception. We find no error.

Although asserting a claim of error, Plaintiffs express within the body of their cross-appeal that the retrospective enforceability of the Master Commercializa-

---

12. As it is clear from the record that it was within the court's discretion to assess more monetary sanctions than it chose, we decline to entertain AgBorn's contention that the court erroneously included attorney fees other than those related to discovery in its sanctions.

tion Agreement is no longer an issue because the trial court declined to rule on the issue, Plaintiffs prevailed on their claim for damages under an unjust-enrichment theory at trial, and Plaintiffs voluntarily dismissed whatever portion of Count VIII that remained. AgBorn argues that Plaintiffs waived this issue for appeal by not trying Count VIII to the jury and by voluntarily dismissing Count VIII.

Given that Plaintiffs agree that they voluntarily dismissed the portions of Count VIII not affected by the court's grant of summary judgment as to that count, we find that Plaintiffs have nothing to appeal as to Count VIII.[13] Once a plaintiff files a voluntary dismissal of a claim, it is as if the claim had never been brought. *See Richman v. Coughlin,* 75 S.W.3d 334, 338 (Mo. App. 2002). When Plaintiffs dismissed what remained of Count VIII, they waived any claim of error they might have otherwise had regarding the court's prior rulings regarding the remainder of that count. Plaintiffs' cross-appeal is denied.

## Conclusion

The circuit court did not err in granting Plaintiffs' Motion for Partial Summary Judgment as to Count VIII of the Amended Petition as the undisputed facts show that the Master Commercialization Agreement lacks material terms and is unenforceable. Further, the circuit court did not err in granting Plaintiffs' Motion for Partial Summary Judgment as to Count X of the Amended Petition as the Sublicense Agreement lacks material terms and is unenforceable. Further, the circuit court did not abuse its discretion in denying AgBorn's Motion for Leave to File a Coun-

terclaim as the counterclaim hinged on the enforceability of agreements that are unenforceable. Further, the circuit court did not abuse its discretion in entering sanctions against AgBorn as the court's sanctions evince careful consideration and were not unreasonable in light of AgBorn's discovery abuses. Finally, Plaintiffs waived any claim of error they might have had regarding the court's rulings on Count VIII when Plaintiffs voluntarily dismissed what remained of that count.

The circuit court's judgment is affirmed.

All concur.

13. Plaintiffs also agree that any future claim related to Count VIII would be precluded by Plaintiffs' recovery at trial for unjust enrichment. Consequently, Plaintiffs' claim is moot as well. "A moot issue is one upon which, if

we resolved it in the appellant's favor, our holding would have no practical effect." *T.C.T. v. Shafinia,* 351 S.W.3d 34, 36 (Mo. App. 2011).