Philip M. Hess, Judge *58 Introduction
Thomas A. Stricklin was found guilty of first-degree statutory sodomy by a St. Francois County jury and was sentenced to thirty years' imprisonment. At his trial, the State introduced and the trial court admitted incriminatory statements Stricklin made during an audio-recorded interview of Stricklin at the Desloge police station and a written statement Stricklin made after the recording ended.
Stricklin's sole point on appeal is the trial court clearly erred by denying his motions to suppress and admitting into evidence the incriminating statements he made in the audio recording and written statement because he contends the interview became custodial and violated his Miranda[1] rights and right against self-incrimination after he unequivocally and repeatedly asked for a lawyer. Because we conclude Stricklin's interview became custodial and he was never Mirandized , we reverse and remand for a new trial.
Factual and Procedural Background
L.P. ("Victim") was born in June of 2010. In April 2012, Victim's mother ("Mother") began dating Stricklin. On January 27, 2013, Stricklin spent the night at Mother's home with Victim and her five-year-old brother. On the morning of January 28, 2013, Mother awoke to Victim crying and saying, "Pee-pee." Mother checked Victim's diaper and found Victim's vagina bleeding. Stricklin was awoken by Mother and she asked him if he knew what was wrong with Victim. Stricklin denied knowing anything, but after seeing Victim, suggested she may have fallen on a toy in her room.
Mother took Victim to her doctor and her doctor sent her to Children's Hospital. Surgery was performed on Victim and she remained in the hospital for five days. Stricklin did not go to the hospital. Mother called Stricklin and asked if he had anything to do with Victim's injuries and he denied he did.
A. The Police Interview
Officer Brad Judge of the Desloge Police Department called Stricklin and asked him to come to the police station. On Thursday, January 31, 2013, Stricklin went to the police station and Officer Judge patted him down in the lobby before taking him down the hall to the interview room. Stricklin was interviewed by Officer Judge, Officer Stacy Minze, a criminal investigator for the Missouri State Technical Assistance Team, and Angela McCreary, a Missouri Department of Social Services case worker. The interview was audio recorded and lasted just over an hour. Stricklin was told by Officer Judge he was not under arrest before the audio recording started.
During the interview, Stricklin initially denied knowing how Victim was injured and indicated he thought Victim fell on a toy and was injured. Officers Judge and Minze told Stricklin they thought he knew more than he was telling them. At about nine minutes into the interview, Officer Judge stated, "You know what's going on. There's no doubt in our mind. I told you, we've done our homework." Stricklin responded, "Do the homework. Where's my lawyer?" Officer Minze told Stricklin, "That's your choice." Stricklin then said he was "not saying anything else," but then continued to respond to Officers Judge and Minze. Officer Minze explained to Stricklin that this was his chance to explain his side of the story, and Stricklin said, "Yeah. And that's why I volunteered to come down here."
*59 Stricklin continued to deny he injured Victim, and the officers' accusations against Stricklin became more direct. Officer Minze told Stricklin, "I know that you're gonna sit there as long as you can and say that you didn't do it. But I know that you did. I know that you did. And now's your chance." After showing Stricklin a photograph of Victim's injury, Officer Minze told Stricklin, "You caused that injury." Officer Judge told Stricklin they knew he did it because he and Mother were the only two people in the house who could have caused that injury. Stricklin told Officer Judge to charge Mother. Officer Judge responded by stating they would charge Mother and Stricklin if that is what they had to do. The exchange between Officer Judge and Stricklin was argumentative and at about eighteen minutes into the interview, Officer Judge said, "Well, I'm gonna step out and let you talk to these two ladies. When I come back in, if you haven't settled this up, and straightened it out, you're probably going. You're going in cuffs. I don't believe you for one minute." Stricklin replied, "I want a lawyer. Right now." Officer Minze again told Stricklin, "That's your choice."
Officer Judge then left the interview room and closed the door on the way out. Officer Minze told Stricklin she could not tell him not to get a lawyer, but said he did not have to get one. Officer Minze told Stricklin she wanted to help him. She informed Stricklin that Victim may have to take "anti-AIDS medicine" for thirty days if they could not test the person who did this, and the medicine made Victim sick and throw up. In response, Stricklin said he was "not admitting to anything," but asked what he would be looking at if he admitted to causing Victim's injury. Stricklin asked, "Am I gonna go to jail?" Officer Minze responded, "Yeah, you will probably go to jail."
Stricklin continued to inquire about what type of punishment he may be looking at and Officer Minze told Stricklin it depended and was not up to her, but told him taking responsibility for his actions would make a big difference in the eyes of the prosecutor and judge. Officer Minze asked Stricklin how he wanted to look: as the guy who accepts responsibility or as the guy who denies it when they are going to prove it was him anyway. Stricklin stated, "Either which way I'm going to jail tonight? According to him, correct?" Officer Minze said, "Well you're talking to me now. Let's deal with one thing at a time."
At about twenty-four minutes into the interview, Stricklin said he did not want to go to jail today and wanted to spend the weekend with his family. He said his "deal" was he would turn himself in Monday. Officer Minze told him she could not promise that. Stricklin replied, "Then I want a lawyer right now." Stricklin then continued to talk, stating "You're gonna take me to jail." Stricklin continued to try and negotiate terms that would prevent him from going to jail that day and Officer Minze repeatedly told him she could not promise him those terms. Stricklin said, "Either which way, you're taking me to jail then. Unless you tell me that." Officer Minze responded, "I can't tell you that I'm not. I can't.... What guy you gonna be, you know? The one that comes in here and owns up to what happened or you gonna be the one that's gonna let her sit in the hospital for a few more days throwing up and being sick and having stomach pains?" Stricklin replied, "But it doesn't matter if you're gonna take me to jail either which way." Officer Minze stated, "Yeah, but if you don't tell me what happened then she still has to take the medication." Stricklin said, "Then you're gonna give me the test when you arrest me." Officer Minze told Stricklin they were not going to test him and stop medicating Victim until they were *60 100% sure that he was the person who caused Victim's injury. Stricklin told Officer Minze that he wanted a guarantee he was not going to jail tonight and Officer Minze told him she could not do that. Stricklin offered to turn himself in the next day and Officer Minze said, "I can't guarantee that." Stricklin replied, "[T]hen I didn't do it. I want to get my affairs in order. Can you please do that?"
McCreary informed Stricklin that after he told them what happened she could help him get his affairs in order and tried to persuade Stricklin to tell her what happened. Stricklin said, "Tell me I ain't going to jail tonight." Officer Minze responded, "I can't do that." Stricklin said, "Tell me I can get out tomorrow." Officer Minze responded, "That would be whatever bond they set. I mean, if you go, I can't tell you that." Stricklin said, "I want to know you're, what exactly is I'm being charged with right now? What exactly are you charging the person that did this with right now?" Officer Minze stated it would be sexual assault. Stricklin said, "I want tomorrow to get my affairs in order. Please?" Officer Minze responded, "I can't promise you that. I mean, you'll have bond." Stricklin asked if he would get a public defender if he admitted to causing Victim's injury and Officer Minze told him he would get a public defender if he did not have the means for an attorney. Stricklin stated, "[i]f that's what it takes to keep her out of trouble," then admitted he accidently put his finger in Victim's vagina. Stricklin said Victim was crying in the middle of the night and he found her in the closet with her diaper around her ankles so he picked her up, tripped over a toy, fell, and when he did, his finger went inside Victim's vagina. He said he did not see any blood.
After the audio recording stopped, Stricklin was asked if he wanted to write a letter to Mother, and he did. Stricklin wrote:
I admitted to falling with [Victim] and hurting her. I'm sorry I [l]ied about it but when I seen [sic] all the blood I [f]reaked out. I know you probably hate me now and I deserve it but at least know it was an accident and I didn't mean to hurt her. I'm probably still goin[g] to jail so maybe that makes you feel better. I still love all of you and I'm sorry. Please help me or at least let me know if you don't want to see me anymore.
Stricklin was arrested after the interview ended and never read his Miranda rights.
B. Pre-trial and Trial Proceedings
On December 18, 2015, a St. Francois grand jury charged Stricklin by indictment with first-degree statutory sodomy. On March 17, 2016, Stricklin moved to suppress the oral statements he made in the interview. On May 23, 2016, the court held a hearing on Stricklin's motion. At the hearing, Officers Judge and Minze testified. Officer Minze testified about the letter Stricklin wrote to Victim's mother after the interview stopped being recorded. Defense counsel informed the court that the defense did not have the letter. The court advised the parties it would take up the issue of the letter at a future hearing.
On June 23, 2016, Stricklin moved to suppress the letter he wrote to Victim's mother. On July 26, 2016, the court denied the motion to suppress the oral statements made during the interview. On September 15, 2016, the court held a hearing on the motion to suppress the letter. Officers Judge and Minze again testified. On November 9, 2016, the trial court denied the motion to suppress the letter.
On December 8, 2016, trial was held. The State called Mother, Officer Judge, *61 Dr. Diane Merritt, a pediatric gynecologist at Children's Hospital who treated Victim, and Officer Minze. The interview and the letter were both admitted as evidence. Stricklin did not present any evidence. The jury found Stricklin guilty as charged and recommended a thirty-year sentence. On February 3, 2017, Stricklin was sentenced to thirty years' imprisonment. Stricklin moved to file a late of notice of appeal with this Court which was granted. This appeal follows. At issue is whether the trial court erred in finding Stricklin was not subjected to a custodial interrogation.
Standard of Review
A trial court's ruling on a motion to suppress will be reversed only if it is clearly erroneous. State v. Lammers , 479 S.W.3d 624, 630 (Mo. banc 2016). If after a review of the entire record, the court is left with the definite and firm impression a mistake has been made, the trial court's ruling will be deemed clearly erroneous. Id. We defer to the trial court's factual findings and credibility determinations and consider all evidence and reasonable inferences in the light most favorable to the trial court's ruling. Id. Factual issues on motions to suppress are mixed questions of law and fact. State v. Werner , 9 S.W.3d 590, 595 (Mo. banc 2000). Whether the Fifth Amendment or any other provision of the United States Constitution was violated is a question of law that this Court reviews de novo. State v. Holman , 502 S.W.3d 621, 624 (Mo. banc 2016).
Two discrete inquiries are essential to the "in custody" determination: (1) what were the circumstances surrounding the interrogation; and (2) given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Thompson v. Keohane , 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). Determining the circumstances surrounding an interrogation is a factual inquiry. Id. Given those circumstances, whether a reasonable person would have felt he or she was at liberty to terminate the interrogation and leave presents a mixed question of law and fact qualifying for independent review. Id. "[T]he State has the burden of showing, as a matter of law, that even after the officer took control of the continuation of the interview, a reasonable person would have still believed she was free to leave." State v. Brooks , 185 S.W.3d 265, 281 (Mo. App. W.D. 2006) ; see also § 542.296.6 RSMo (2016) ("The burden of going forward with the evidence and the risk of nonpersuasion shall be upon the state to show by a preponderance of the evidence that the motion to suppress should be overruled."). The "reasonable person" test presupposes an innocent person. Florida v. Bostick , 501 U.S. 429, 438, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).
Applicable Law
The Fifth Amendment of the United States Constitution provides that no person shall be compelled to be a witness against himself in any criminal case. The Sixth Amendment guarantees the right to counsel for an accused in all criminal prosecutions. The United States Supreme Court "held in Miranda that a person questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.' " Stansbury v. California , 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (quoting Miranda , 384 U.S. at 444, 86 S.Ct. 1602 ).
*62 A criminal suspect is entitled to Miranda warnings once the suspect is subjected to a custodial interrogation. Holman , 502 S.W.3d at 625. A custodial interrogation occurs when the suspect is formally arrested or subjected to arrest-like restraints. Id. Statements obtained in a custodial interrogation prior to Miranda warnings are subject to suppression at trial. Id. Once a suspect is given Miranda warnings, if that suspect invokes his or her right to remain silent, the interrogation must cease. Id. Similarly, if a suspect invokes his or her Fifth Amendment right to counsel, the police must suspend all interrogation and may not question again unless counsel is present. Id.
If a person is free to go at any time, then the person is not under arrest. State v. Glass , 136 S.W.3d 496, 509 (Mo. banc 2004). Questioning that takes place in a coercive environment does not require Miranda warnings if there is no arrest or restraint of freedom of movement. Id. at 511. Police questioning of a suspect at the station house is not always custodial. Howes v. Fields , 565 U.S. 499, 507, 132 S.Ct. 1181, 182 L.Ed.2d 17 (2012). Custody is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. Id. at 508-09, 132 S.Ct. 1181. An interview can start as an investigative interview, and then at some point be transformed into an in-custody interview. State v. Quick , 334 S.W.3d 603, 616 (Mo. App. W.D. 2011) ; Brooks , 185 S.W.3d at 281.
Courts must examine all of the circumstances surrounding the interrogation to determine how a suspect would have gauged his freedom of movement. Howes , 565 U.S. at 509, 132 S.Ct. 1181 (quoting Stansbury , 511 U.S. at 322, 325, 114 S.Ct. 1526 ) (internal quotation marks omitted). Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the suspect at the end of the questioning. Howes , 565 U.S. at 509, 132 S.Ct. 1181 (internal citations omitted).[2] Other potential factors to consider include: (1) a suspect's freedom to leave; (2) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not under arrest; (3) whether the suspect possessed unrestrained freedom of movement during questioning; (4) whether the suspect initiated contact with authorities or voluntary acquiesced to official requests to answer; (5) whether strong arm tactics or deceptive stratagems were employed during questioning; (6) whether the atmosphere was police dominated; and (7) whether the suspect was placed under arrest at the termination of questioning. Werner , 9 S.W.3d at 595 (citing United States v. Griffin , 922 F.2d 1343, 1348-49 (8th Cir. 1990) ).
While the subjective beliefs of the investigating officers are generally irrelevant to whether a suspect is in custody, State v. Schneider , 483 S.W.3d 495, 501 (Mo. App. E.D. 2016), if those beliefs are conveyed to the individual being questioned, those beliefs are relevant to the *63 extent they affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action. Stansbury , 511 U.S. at 325, 114 S.Ct. 1526. Custody is more likely to exist if the police initiate contact with the suspect. State v. Tally , 153 S.W.3d 888, 894 (Mo. App. S.D. 2005). Voluntarily acquiescing to an officer's request to answer questions does not mean a suspect is not in custody. Id.
The Quick court described the custody issue as follows:
The issue is what a reasonable person would have thought about the degree of his freedom to ask the officers to leave. It is not about whether it would have been awkward to ask the officers to leave, or whether it would have tended to increase suspicion of guilt by asking them to leave, or whether it might have seemed impractical in some other way. The issue is not even whether it is an intimidating thing to be interviewed by the police. Of course it is intimidating, [ Oregon v. Mathiason , 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) ], but the issue is whether a reasonable person in those circumstances would have believed that he had in fact lost his freedom to insist that the interview was over so he could leave.... The issue, in other words, is whether a reasonable person would have believed that the officers were going to insist on restraining him from [leaving] until they were through.
Quick , 334 S.W.3d at 617.
The list of factors a court may consider is not exhaustive, and their presence and absence merely guide courts in assessing the totality of the circumstances surrounding interrogations. Werner , 9 S.W.3d at 595-96. It is not always necessary or appropriate to determine custody by weighing the factors, and we must look at the totality of the circumstances. State v. Bruce , 503 S.W.3d 354, 358 (Mo. App. S.D. 2016). The circumstances of each case influence the custody determination, but the ultimate inquiry is whether there is a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest. Stansbury , 511 U.S. at 322, 114 S.Ct. 1526. "Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve 'the ultimate inquiry': '[w]as there a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' " Thompson , 516 U.S. at 112, 116 S.Ct. 457 (citing California v. Beheler , 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam) (quoting Mathiason , 429 U.S. at 495, 97 S.Ct. 711 ) ).
If an individual's freedom of movement has been restricted enough to amount to custody for purposes of Miranda , then the next issue is "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda ." Howes , 565 U.S. at 509, 132 S.Ct. 1181. Those issues include the "shock that very often accompanies arrest." Id. at 511, 132 S.Ct. 1181. "[D]etention represents a sharp and ominous change, and the shock may give rise to coercive pressures." Id. "A person who is 'cut off from his normal life and companions,' [citation omitted], and abruptly transported from the street into a 'police-dominated atmosphere,' [citation omitted], may feel coerced into answering questions." Id. Another issue is whether the person is likely to be lured into speaking by a longing for prompt release. Id. "When a person is arrested and taken to a station house for interrogation, the person who is questioned may be pressured to speak by the hope that, after doing so, he will be allowed to leave and go home." Id. Another *64 issue is whether the person will feel compelled to speak by the fear of reprisal for remaining silent or in the hope of a more lenient treatment if the person confesses. Id. at 512, 132 S.Ct. 1181.
Analysis
Stricklin contends the trial court clearly erred by denying his motions to suppress because he was not read Miranda warnings and his right against self-incrimination was violated after he unequivocally and repeatedly asked for a lawyer. The State asserts the trial court did not clearly err in denying Stricklin's motions because Stricklin was not in custody when he was interviewed.
Here, the first issue we must determine is whether a reasonable person would have felt he or she could have terminated the interview Stricklin had with the police. We conclude, based on the totality of the circumstances of the particular facts of this case, Stricklin's interrogation became custodial when Officer Judge accused Stricklin of causing Victim's injuries and said: "Well, I'm gonna step out and let you talk to these two ladies. When I come back in, if you haven't settled this up, and straightened it out, you're probably going. You're going in cuffs. I don't believe you for one minute." Stricklin responded, "I want a lawyer. Right now." Stricklin was again told that was his choice before Officer Judge left the interview room and closed the door behind him on the way out.
We conclude a reasonable person would not believe at this point that he or she could leave or terminate the interview at least until Officer Judge came back into the interview room. See Brooks , 185 S.W.3d at 282 (concluding the interrogation changed to custodial when the officer restricted the suspect's freedom by promising to leave "after this," which was essentially telling, and not asking, the suspect "to remain still longer, with the promise that 'after this' she could leave."). Officer Judge not only told Stricklin he was "going in cuffs," but by telling Stricklin he better straighten this out before he came back in, we conclude a reasonable person would find Officer Judge's statements to be coercive. Cf. Baumruk v. State , 364 S.W.3d 518 (Mo. banc 2012) (finding no custodial interrogation of prisoner where "[n]othing in the record indicates that [prisoner's] interviews took place in a coercive atmosphere or that any coercive techniques were used."). A reasonable person would not know what they had to do to settle "this" up or "straighten it out" or how long Officer Judge would be gone before he came back and made the determination of whether Stricklin was free to leave or was "going in cuffs." See Brooks , 185 S.W.3d at 282 ("Because Brooks was given no opportunity to know what 'this' was or how long 'this' would take, and because the officer purposely avoided discussion about the purpose or the length of the next stage of the interview, the officer's statements left Brooks at the officer's mercy.").
The totality of the circumstances both before and after Officer Judge made these statements to Stricklin further support Stricklin's interview became custodial. First, while prior to the start of the interrogation, Officer Judge told Stricklin he was not under arrest, this was mitigated by Stricklin never being informed he could terminate the interview and walk away or refuse to answer their questions. See Tally , 153 S.W.3d at 894 ("Hamilton at no time informed Appellant that he could terminate the conversation with Hamilton at will, mitigating somewhat any inference to be drawn from the fact that Hamilton told Appellant he was not under arrest."). Advising a suspect that he or she can terminate the interview at will or that he or she *65 has the liberty to decline to answer questions is an important factor. See Werner , 9 S.W.3d at 596 (citing Griffin , 922 F.2d at 1349 ). But the police did not advise Stricklin he could stop the interview or refuse to answer questions despite Stricklin indicating multiple times he wanted a lawyer and was not going to say anything else. Moreover, Officer Judge, who told Stricklin he was not under arrest, had left the interview room, and the interrogation was now being conducted by Officer Minze. Officer Minze responded affirmatively when Stricklin asked if he was going to go to jail and refused to tell Stricklin he was not going to jail that night when asked multiple times. While early in the interrogation Stricklin indicated he had come to the station voluntarily, this was prior to Officer Judge's statements which turned the interview into a custodial interrogation. See State v. Dixon , 655 S.W.2d 547, 552 n.2 (Mo. App. E.D. 1983) ("At some point between defendant's voluntary appearance at the police station and the making of his inculpatory statements, a belief that he was not free to leave would have certainly been reasonable.") (overruled on other grounds).
Second, the atmosphere was police dominated throughout the interview. First, the interview was conducted at the police station in an interview room with two officers and a case worker present at the beginning of the interview. While Officer Judge left during the interview, he indicated he was coming back and told Stricklin he better have this figured out before he did or he was "going to be in cuffs." Moreover, it is clear that after Officer Judge left the interview room, the door to the room was closed. While Stricklin voluntarily came to the police station, he did so at Officer Judge's request, making custody more likely to exist. See Tally , 153 S.W.3d at 894.
Third, the officers told Stricklin he would be charged and was going to jail. Officer Judge told Stricklin they knew Stricklin caused Victim's injury and they would charge Stricklin and Mother if they had to. When Stricklin asked Officer Minze if he was going to jail, she responded affirmatively. In attempting to convince Stricklin to take responsibility, Officer Minze told Stricklin they were going to prove it was him anyway. Stricklin repeatedly tried to get Officer Minze to assure him that he could leave for the weekend and Officer Minze told Stricklin that she could not promise him that. When Stricklin asked Officer Minze if they were taking him to jail, Officer Minze said she could not tell him they were not. When Stricklin asked what he was being charged with and what they were charging the person who did this with, Officer Minze responded sexual assault. See State v. Thompson , 425 S.W.2d 80, 83 (Mo. 1968) (finding that although there was "no testimony that the officer stated explicitly that he placed the [defendant] under arrest on the marijuana charge," the statement that defendant was going to be charged with possession of marijuana was sufficient to advise defendant of that fact). When Stricklin inquired about having the next day to get his affairs in order, Officer Minze told Stricklin he would have a bond. While the subjective beliefs of the investigating officers is generally irrelevant to whether a suspect is in custody, Schneider , 483 S.W.3d at 501, those beliefs are relevant to how a reasonable person would interpret them in the custody analysis, Stansbury , 511 U.S. at 325, 114 S.Ct. 1526. We conclude a reasonable person in Stricklin's shoes would not believe he or she was free to leave under the totality of the circumstances. See Quick , 334 S.W.3d at 617.
Lastly, that Stricklin was arrested after the interrogation concluded supports he *66 was in custody. Tally , 153 S.W.3d at 895 (finding fact that appellant was arrested immediately after making incriminating statement to support custodial interrogation). Even then Stricklin was not read his Miranda rights. Given the totality of the circumstances, we conclude Stricklin was in custody from the time of Officer Judge's statement that he was "going in cuffs," but our analysis does not stop there.
We must also decide "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda ." Howes , 565 U.S. at 509, 132 S.Ct. 1181. We conclude that it does. Like the cases in Miranda , Stricklin was questioned by police, without Miranda warnings, in a room in which he was cut off from the outside world, resulting in incriminating statements. See Miranda , 384 U.S. at 445, 86 S.Ct. 1602 ("They all thus share salient features-incommunicado interrogation of individuals in a police-dominated atmosphere, resulting in self-incriminating statements without full warnings of constitutional rights."). We also note Stricklin initially denied knowing how Victim was injured and did not speak to the issue until being subjected to numerous police tactics, including numerous statements by Officer Minze that might compel a reasonable person to speak in hopes of a more lenient treatment. Howes , 565 U.S. at 512, 132 S.Ct. 1181. Thus, we conclude the trial court erred in finding the State met its burden of proving a reasonable person would have believed he or she was free to leave given the totality of the circumstances. Brooks , 185 S.W.3d at 281.
The Dissent
The dissent disagrees, finding State v. Hill , 247 S.W.3d 34 (Mo. App. E.D. 2008), particularly relevant. In Hill , the defendant voluntarily drove to the police station for questioning with his wife. The officer met the defendant and his wife in the lobby and advised the defendant's wife she could not go to the interview room but could wait in the lobby. The officer escorted the defendant to the second floor interview room. The officer was not in uniform but he had an exposed firearm which he removed prior to the start of the interview. At the beginning of the interview, the officer informed the defendant he was not under arrest, the door was unlocked, and he was free to go if he wanted to leave. The defendant acknowledged he understood, and the officer said, "We need to talk about this and get it straightened out." After about forty minutes into the interview, the defendant asked to use the restroom, and the officer told him he could take him "downstairs to use the restroom, but we have to come right back up and talk." The defendant responded, "Okay." The officer escorted the defendant to a jail cell bathroom and stood outside of the cell while the defendant used the restroom. The officer escorted the defendant back to the interview room and continued the interview. Approximately fifteen minutes later, the defendant admitted he had touched the victims' genitals. The officer was polite and respectful during the interview. At the end of the interview, the officer told the defendant he was going to give the defendant a few minutes by himself unless he was ready to go immediately. The defendant answered he was not ready and the officer left him alone in the room. When the officer returned, he asked the defendant if he was ready to go home, and the defendant indicated he was. The defendant was escorted to the lobby where his wife was waiting. The defendant was not detained, fingerprinted, processed, or booked, and no arrest was made at that time.
The Hill court concluded the totality of the circumstances surrounding the defendant's *67 interview would not have compelled a reasonable person to "have understood the situation to be one of custody." Id. at 51. Specifically, the court found:
Here a reasonable person, who voluntarily came to the police station for an interview, who was told he was not under arrest and could leave if he wanted, whose wife was waiting for him in the lobby of the station, who was not physically restrained, and who was treated politely, was allowed a bathroom break, was interviewed by only one officer who had removed his weapon, was interviewed for approximately one hour, was not arrested at the end of the interview, and elected to stay a few minutes, rather than leave immediately, would not have considered his freedom of action restricted to the degree associated with a formal arrest.
Id. at 51-52. The dissent concludes the interview in Hill was "conducted under much more restrictive circumstances" than the interview in this case. We respectfully disagree.
As Hill pointed out, advising a suspect he is not under arrest and can terminate the interview or can decline to answer questions is one of the most obvious and effective means of demonstrating that a suspect has not been taken into custody. Hill , 247 S.W.3d at 48. The officer in Hill advised the defendant he was not under arrest, the door was unlocked, and he was free to go if he wanted to leave. The officers here never told Stricklin he was free to leave. To the contrary, after accusing Stricklin of committing the crime and arguing with Stricklin about whether he was telling the truth, Officer Judge told Stricklin before leaving the interview room and closing the door, "Well, I'm gonna step out and let you talk to these two ladies. When I come back in, if you haven't settled this up, and straightened it out, you're probably going. You're going in cuffs. I don't believe you for one minute." Stricklin replied, "I want a lawyer. Right now." Telling someone you need to straighten this out before I get back or "[y]ou're going in cuffs" is hardly an obvious and effective means of demonstrating to a reasonable person you are not in custody. Further, we do not believe the record supports the dissent's determination that the officers vaguely mentioned Stricklin's possible arrest. Stricklin was told he would be charged, that he was "going in cuffs," and when asked if he was going to jail, Officer Minze said, "Yeah, you will probably go to jail." Taking this in context with Officer Minze's repeated refusal to tell Stricklin he was not going to jail, her refusal to commit to Stricklin's request to have a few days to get his things in order, and her informing Stricklin he would be charged with sexual assault, does not support only a vague mention of a possible arrest.
Moreover, the Hill court correctly noted that statements must be analyzed in context. Id. at 49-50. The dissent asserts that "[s]imilar to the statement in Hill it is clear the police wanted to get the allegations 'straightened' out and 'settled' by virtue of their investigation," but the context of the officer telling the defendant in Hill that "[w]e need to talk about this and get it straightened out" after telling the defendant the door was not locked, he was not under arrest, and he was free to leave at the beginning of the interview, is drastically different than the context in this case. In Hill , there was "no indication defendant did not continue to understand that he was free to leave after [the officer] said, 'we need to talk about this." 247 S.W.3d at 49. Rather, the Hill court found it showed the defendant "agreed that they needed to talk, and he understood 'all that.' " Id. In this case, after Officer Judge told Stricklin "if you haven't settled this up, and straitened it out" by the time he *68 got back or he was "going in cuffs," Stricklin replied, "I want a lawyer. Right now." Considering the context of these statements, we fail to see their similarity and disagree with the dissent's assessment that "[t]he general tenor of the interview is not aggressive." As to the dissent's conclusion that the officers "did not mislead [Stricklin] or make any promises as the police did in Hill ," that is not relevant to the custody determination. Id. at 50 ("False statements made to defendants during interrogation about the existence of inculpatory evidence are not relevant to a determination of whether a suspect is 'in custody.' "). Further relevant distinguishable facts from Hill include that Stricklin was at the police station alone, not with someone in the lobby waiting for him, and was arrested at the end of the interview. Id. at 51-52. We conclude Hill is distinguishable from the case at hand. The circumstances of each case control the custody determination. Stansbury , 511 U.S. at 322, 114 S.Ct. 1526. The particular facts of this case lead us to find Stricklin's interview became custodial.
Conclusion
The Fifth Amendment privilege against self-incrimination goes to the root of American criminal jurisprudence and is so fundamental to our system of constitutional rule that the United States Supreme Court held in Miranda that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda , 384 U.S. at 439-45, 86 S.Ct. 1602. Those procedural safeguards were not given to Stricklin and the violation of his constitutional rights cannot be condoned. This does not mean that Stricklin's statements may not subsequently be used for impeachment if they were made voluntarily. See State v. Mitchell , 611 S.W.2d 211, 213 (Mo. banc 1981) ("The law is clear that statements obtained by the police where the Miranda rules have not been observed may be used for impeachment purposes only if they are in fact voluntary."). Nor does it mean all of the statements are subject to suppression. See Brooks , 185 S.W.3d at 284. We determine that all statements obtained, including the written statement, following Officer Judge's statement to Stricklin before leaving the interrogation constituted custodial interrogation that must be suppressed on Miranda grounds. See id. The portion of the audio tape prior to that time did not constitute custodial interrogation and is not subject to suppression on Miranda grounds. Stricklin's point is granted.
For the reasons stated above, the judgment of the trial court is reversed and remanded for further proceedings consistent with this Opinion.
Roy L. Richter, J. concurs.
Lisa P. Page, P.J. dissents in a separate opinion.
Dissent
Lisa P. Page, Presiding Judge
I respectfully dissent. I agree the constitutional protections afforded by the Fifth and Sixth Amendment are sacrosanct. However, I do not agree with the majority's conclusion the present case amounts to a custodial interrogation. The sole issue in this matter is one of "custody." A criminal suspect is entitled to Miranda warnings once the interview becomes a custodial interrogation. Miranda v. Arizona , 384 U.S. 436, 444-45, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), State v. Holman , 502 S.W.3d 621, 625 (Mo. banc 2016). The majority correctly finds the relevant inquiry is whether a reasonable person would believe *69 he was free to leave under the totality of the circumstances. Thompson v. Keohane , 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995).
Missouri courts have enumerated several non-exhaustive factors to consider when making this determination. These are: (1) the suspect's freedom to leave and whether he was informed the questioning is voluntary, he was free to leave, or was not under arrest; (2) the suspect's freedom of movement; (3) whether the suspect initiated the contact with authorities or voluntarily agreed to the interview; (4) whether strong arm tactics or deceptive stratagems were employed during the interview; (5) whether the interview was conducted in a police-dominated environment; and (6) whether the suspect was arrested following the termination of the interview. State v. Hill , 247 S.W.3d 34, 45 (Mo. App. E.D. 2008) (citing State v. Werner , 9 S.W.3d 590, 595 (Mo. banc 2000) and United States v. Griffin , 922 F.2d 1343, 1348 (8th Cir. 1990) ). Based upon these factors and the totality of the circumstances, the majority concludes a reasonable person would not have believed he was free to leave thus Stricklin was subject to a custodial interrogation without the benefit of his constitutionally mandated right to a Miranda warning. I disagree.
I find this court's opinion in State v. Hill particularly relevant to the facts in this case wherein our court did not find a custodial interrogation during an interview conducted under much more restrictive circumstances. 247 S.W.3d 34. The Hill defendant voluntarily went to the station for questioning. Id. at 49. During the interview the officer said, "We need to talk about this and get it straightened out." Id. Hill was given permission to use the bathroom but informed "we have to come right back up and talk." Id. Then he was escorted to a jail cell bathroom where a police officer stood guard. Id. Hill claimed the officers made misleading statements and promises of leniency during the interview but the court held it is appropriate for an investigator to advise a suspect of the potential course and consequences of the investigation. Id. at 51. Our court held this was not a custodial interrogation because considering the totality of the circumstances a reasonable person would not have considered his freedom of action restricted. Id. at 52.
The general tenor of the interview is not aggressive, but the majority finds certain statements made to Stricklin were coercive. In particular, Officer Judge said, "[w]hen I come back in, if you haven't settled this up, and straightened it out, you're probably going. You're going in cuffs. I don't believe you for one minute." He then left the room approximately eighteen minutes into the interview. Officer Minze (a criminal investigator for the Missouri State Technical Assistance Team) and Angela McCreary (a social worker with the Missouri Department of Social Services) continued the interview. Later in the interview when Stricklin asked if he was going to jail, Officer Minze responded "probably." She immediately qualified her answer saying, "I don't know," emphasizing she was not the person who would make that decision and told Stricklin she could not promise what might happen to him.
However, Stricklin was not placed under arrest prior to questioning and acknowledged during the interview he "volunteered to come down here." He was not physically restrained during the interview which lasted approximately one hour. This lack of physical restraint coupled with an interview of short duration demonstrates a reasonable person in the situation would have felt free to leave. See Hill , 247 S.W.3d at 48.
*70 When considered in the context of the totality of the circumstances, these statements upon which the majority relies were not so coercive as to convert Stricklin's voluntary interview to a custodial interrogation. Police strategies motivated by a desire to elicit a confession do not necessarily give rise to a duty to issue Miranda warnings. State v. Sardeson , 220 S.W.3d 458, 469 (Mo. App. S.D. 2007) ; See also State v. Brooks , 185 S.W.3d 265, 277 (Mo. App. W.D. 2006) and State v. Middleton , 854 S.W.2d 504, 513-14 (Mo. App. W.D. 1993). Similar to the statement in Hill it is clear the police wanted to get the allegations "straightened" out and "settled" by virtue of their investigation. Officer Judge's statements to that effect do not necessarily result in a finding of coercion.
Officers Judge and Minze informed Stricklin of what might happen. They did not mislead him or make any promises as the police did in Hill . Id. at 49. The officers' vague mention of Stricklin's possible arrest as a potential outcome of the investigation did not transform the interview to a custodial interrogation. The fact that he was faced with a difficult decision regarding the potential consequences of the investigation, specifically potential arrest or time in jail, did not result in a finding that the interview became a custodial interrogation.
Finally, we note not all questioning conducted in the station house is considered custodial. Howes v. Fields , 565 U.S. 499, 507, 132 S.Ct. 1181, 182 L.Ed.2d 17 (2012). Here, the interview was initially conducted in a room with only two officers and a social worker present. Approximately eighteen minutes into the interview, Officer Judge left the room, leaving only Officer Minze and a social worker for the remainder of the interview. His absence further reduced the element of a "police dominated" environment because only one police officer was present at the time of Stricklin's confession.
Based upon the totality of the circumstances in this case, I find the facts too similar to those in Hill and a reasonable person in Stricklin's circumstances would have believed he was free to leave. An interview at the station house lasting a little more than an hour to investigate any serious crime during which the suspect voluntarily appeared, was not arrested or physically restrained in any way, and was informed of the potential course and consequences of the investigation does not amount to a custodial interrogation. Under the particular circumstances of this case, I would affirm the trial court's decision to deny the motion to suppress and admit the audio and written statements.

See Miranda v. Arizona , 384 U.S. 436, 444-45, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

See also State v. Brown , 18 S.W.3d 482, 485 (Mo. App. E.D. 2000) ("When a prison inmate is questioned, 'the language used to summon the individual, the physical surroundings of the interrogation, the extent to which he is confronted with evidence of his guilt, and the additional pressure exerted to detain him must be considered to determine whether a reasonable person would believe there had been a restriction of his freedom over and above that in his normal prisoner setting.' ") (quoting Cervantes v. Walker , 589 F.2d 424, 428 (9th Cir. 1978) ).