

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| **STATE OF MISSOURI,** | ) | |
| | ) | |
| **Respondent,** | ) | **WD81345** |
| | ) | |
| **v.** | ) | **OPINION FILED:  July 16, 2019** |
| | ) | |
| **DESTYNIE J. WRIGHT,** | ) | |
| | ) | |
| **Appellant.** | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri**
The Honorable Sandra Midkiff, Judge

Before Special Division:  Cynthia L. Martin, Presiding Judge, Alok Ahuja, Judge and
Thomas N. Chapman, Judge

Destynie J. Wright ("Wright") appeals her convictions of one count of involuntary

manslaughter in the first degree, one count of assault in the second degree, two counts of

armed criminal action, and one count of tampering with physical evidence.  Wright argues

that the trial court erred by denying a motion to suppress and admitting her recorded

statement at trial because the statement was made during a custodial interrogation where

Wright had not been informed of her *Miranda*[1] rights.  Wright further argues the trial court

---

[1]*Miranda v. Arizona*, 384 U.S. 436 (1966).

erred because the verdict directors for the charges of involuntary manslaughter and assault submitted elements in the disjunctive, depriving her of unanimous jury verdicts. Finding no error, we affirm.

## Factual and Procedural Background[2]

On December 31, 2015, Wright drove herself and her friend Kierra Ramsey ("Ramsey") to a New Year's Eve party at a dance hall in Kansas City. In the early hours of January 1, 2016, Ramsey's ex-boyfriend, Sederick Jones ("Jones"), arrived at the party, intent on encouraging Ramsey to leave with him. Jones followed Wright and Ramsey into the women's restroom, blocking their exit until a member of the cleaning crew forced them to leave the building. Outside, Jones continued pressing Ramsey to leave with him, and was arguing with Wright. Wright and Ramsey tried to leave in Wright's car, but Jones got into the backseat. Jones continued to argue with Wright and Ramsey for about an hour. During that time, Wright was using her cell phone to text her boyfriend, Ramon Boyd ("Boyd"), in relevant part as follows:

Boyd: Keep [Jones] there.

Wright: Okay.

Wright: He is in my car.

Wright: Come get him now.

Boyd: Okay, pulling up.

Wright: Parking lot.

[2]"'[W]e view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the verdict, disregarding any evidence and inferences that are contrary to the verdict.'" *State v. Lazinger*, 565 S.W.3d 220, 222 n. 1 (Mo. App. W.D. 2018) (quoting *State v. Graham*, 553 S.W.3d 411, 417 (Mo. App. W.D. 2018)).

Boyd: Okay

Wright: NOW!!!!!!!!!!!!!!!!

Boyd: Is he still there?

Wright: YES TK[3] COME GET HIM

Boyd: I am. I got you.

Wright: PASSENGER SIDE

Wright: Now, TK

Wright: )U007

Boyd: Ok. 2 mins

Wright: he gotta gun dude come the fuck on

Boyd: Here.

Shortly after this exchange, Jones and Ramsey exited Wright's vehicle. Boyd shot Jones four times, killing Jones. Ramsey was shot twice. Gunfire shattered a window on Wright's vehicle.

Wright fled the scene in her car. Boyd called Wright moments after the shooting, but Wright did not initiate any calls, including to 911. Wright drove to her sister's house, and parked the car. Boyd met her there. The two retreated to Boyd's home, where Wright stayed until she returned to her sister's house the next morning.

The next morning, Kansas City Police Detectives Jeremy Wells ("Wells") and Darin Penrod ("Penrod"), were looking for Wright as they knew she had been a witness to the

_____

[3]Boyd went by the nickname "TK."

shooting. They were contacted by Wright's sister, who told them that Wright was now at her house. Wells and Penrod arrived at Wright's sister's house, and were invited inside. Wright was sitting on a couch in the living room. Wells and Penrod asked Wright if she would be willing to go to the police station to provide a statement. Wright agreed to do so. As Wright was leaving, Wright's sister asked if she wanted her cell phone. Wright responded that she "did not need her phone." Penrod said "I can take it." Wright's sister handed Penrod the phone. Wright did not object.

Wright rode with Penrod and Wells to the police station in an unmarked police car. She was not restrained in any way. Wright was taken to an interview room. She was offered water and the opportunity to use the restroom. At the beginning of the interview, Wright verbally consented to the Detectives' request to search her cell phone for any information that might be helpful to the investigation.

Wright then provided a statement. Wright explained that she and Ramsey had gone out for the evening; that Ramsey and Jones had been arguing on the phone earlier in the evening; that Jones showed up unexpectedly at the dance hall and began harassing them; and that Jones entered the backseat of her car as she and Ramsey were attempting to leave. Wright told the Detectives that Jones was flashing a gun, and that when Ramsey finally agreed to leave with Jones, she heard gunshots as they exited Wright's car. Wright described seeing Jones and Ramsey fall to the ground, but said she had no idea who shot them. Wright told the Detectives she "blacked out," and fled the scene out of fear. Wright made no mention of Boyd or of his involvement in the shooting. Wright first told the Detectives that she drove away from the scene without checking on the victims, went

4

walking, and eventually sat outside until morning before resetting her phone around 6:00 a.m. Later in the interview, Wright said that she drove to her sister's house after leaving the scene, parked her car, and then walked with no particular destination before ending up at an unknown driveway where she sat and waited for several hours before returning to her sister's house the next morning. Wright confirmed that she was still in her dress from the night before, though she had changed into more comfortable shoes before getting out of her car. During this portion of Wright's statement, the Detectives were cordial, though they pressed Wright about why she had not contacted the police or summoned help for Ramsey, whom Wright described as her best friend.

The Detectives then asked Wright to sign a written form verifying her consent to search her cell phone. Wright again told the Detectives she had been required to hard reset her phone the night before because it had gotten too cold while she was out walking. Wright asked if she could have a lawyer review the consent form. Wright was advised that she did not have to sign the form if she did not want to. Wright did not sign the consent form.

Wells and Penrod took a break from the interview, leaving Wright alone in the unlocked interview room. When they returned, their questioning of Wright remained cordial, but became more aggressive. Penrod challenged the implausibility of Wright's statement, and told Wright that he believed she was covering for someone. They told Wright a preliminary statement had already been taken from Ramsey which called into question the truthfulness of Wright's statement. They impressed upon Wright the importance of telling the truth. They told Wright that it appeared possible that whoever

5

shot Jones may have been acting in justifiable defense of Ramsey, and suggested that Wright's refusal to tell them all she knew was thus difficult to understand. Though the Detectives' questioning of Wright became more pressing and pointed, the Detectives' demeanor remained cordial and respectful. Wright's statement never wavered.

When Penrod continued to press Wright to tell the truth, Wright requested an attorney:

> Penrod: Okay, no, [] let's get to the truth. Let's get to the truth.
>
> Wright: That is the truth what I told you.
>
> Penrod: No, it's not the truth. No, what you're telling me is not the truth.
>
> Wright: Can I get a lawyer or something?
>
> Penrod: Why would you need a lawyer?
>
> Wright: Because you're just . . . you're saying that . . .
>
> Penrod: You're not a suspect. Why . . . why would you . . . why would you need a lawyer [Wright]?
> . . .
>
> Wright: I'm not understanding . . . because I'm telling you the truth. You're trying to pull something out of me [and] I'm telling you everything . . .

Penrod and Wells continued questioning Wright for a short time after her request for an attorney. Wright never altered anything about the statement she had already given.

In total, Wright's interview lasted about two hours. When the interview concluded, Wright was not arrested, and was taken back to her sister's house. The Detectives told Wright at the end of her interview that they would be retaining her cell phone and securing

6

a warrant to search its contents. As a result of that search warrant, the texts exchanged with Boyd prior to the shooting were discovered.

Several months later, Wright was indicted on a theory of accomplice liability for murder in the first degree; two counts of armed criminal action; assault in the first degree; and tampering with physical evidence in a felony prosecution. Wright was not arrested in connection with the shooting until approximately two months after her January 1, 2016 interview. Prior to trial, Wright filed a motion to suppress the entirety of her recorded statement ("Motion to Suppress"), claiming she had been subject to a custodial interrogation without having been Mirandized.[4] Following a hearing, the trial court denied the motion. At trial, Wright's recorded statement was admitted over Wright's objection.

Wright also objected to Instruction No. 11 and Instruction No. 23, the verdict directors respectively for involuntary manslaughter in the first degree, and assault in the second degree. Both verdict directors submitted Wright's culpability on a theory of accomplice liability by requiring that the jury find either "Boyd or Wright" engaged in the conduct described in the verdict director. Wright complained that this disjunctive submission violated her rights to due process and a fair trial.

The jury convicted Wright on all counts. This timely appeal follows.

---

[4]Wright's Motion to Suppress also argued that her cell phone was illegally seized and searched, and that the contents found as a result of the search should be suppressed. That portion of the Motion to Suppress was also denied by the trial court. Wright has not challenged the denial of this aspect of her Motion to Suppress, or the admission into evidence of the information retrieved from her cell phone.

**Analysis**

Wright raises three points on appeal. In her first point, Wright argues that the trial court erred when it denied her Motion to Suppress and admitted her recorded statement at trial because the statement was the result of a custodial interrogation where Wright had not been Mirandized. In her second and third points, Wright argues that Instructions No. 11 and 23 misled the jury and deprived her of due process and a fair trial because they asked the jury to determine, in the disjunctive, whether Boyd or Wright committed the acts described in the verdict directors, rendering it impossible to determine whether the jury returned unanimous guilty verdicts.

**Point One**

Wright argues that her recorded statement was obtained in violation of her *Miranda* rights because, under the totality of the circumstances, Wright was subjected to a custodial interrogation. Wright thus argues that her Motion to Suppress should have been granted, and that the entirety of her recorded statement should have been excluded at trial.

The State has "the burden at [a] suppression hearing to show by a preponderance of evidence that [a] motion to suppress should be denied and the evidence should be admitted." *State v. Brooks*, 185 S.W.3d 265, 272 (Mo. App. W.D. 2006). "[A] trial court's ruling on a motion to suppress will be reversed only if it is clearly erroneous." *State v. Maples*, 551 S.W.3d 634, 643 (Mo. App. W.D. 2018). "[A] trial court's ruling is clearly erroneous if this court is left with a definite and firm belief that a mistake has been made." *Id.* A trial court's denial of a motion to suppress is not clearly erroneous if substantial

8

evidence establishes that the State satisfied its burden. *State v. Rousan*, 961 S.W.2d 831, 845 (Mo. banc 1998); *Maples*, 551 S.W.3d at 643.

In applying this standard of review, we defer to the trial court's factual findings and credibility determinations, and consider all evidence and reasonable inferences in the light most favorable to the trial court's ruling. *State v. Werner*, 9 S.W.3d 590, 595 (Mo. banc 2000). However, whether the trial court's factual findings and reasonable inferences establish that "the Fifth Amendment or any other provision of the United States Constitution [has been] violated is a question of law that this Court reviews *de novo*." *State v. Stricklin*, 558 S.W.3d 54, 61 (Mo. App. E.D. 2018).

Here, it is uncontested that Wright was not Mirandized. The issue is whether Wright was required to be Mirandized. "A criminal suspect is entitled to *Miranda* warnings, consistent with the Fifth Amendment right against self-incrimination, once the suspect is subjected to a custodial interrogation." *Maples*, 551 S.W.3d at 644 (quoting *State v. McClendon*, 477 S.W.3d 206, 212 (Mo. App. W.D. 2015). "Statements obtained by police during a custodial interrogation not preceded by *Miranda* warnings are inadmissible in court." *Id.*

"'Custodial interrogation' occurs either when a suspect is formally arrested or under any other circumstance where the suspect is deprived of his freedom of action in any significant way." *Werner*, 9 S.W.3d at 595. "Custody" for purposes of *Miranda* warnings, "is a term of art used to specify circumstances that are thought to present a serious danger of coercion." *Maples*, 551 S.W.3d at 644. "In deciding whether a suspect is "in custody" at a particular time, courts examine the extent of the restraints placed on the suspect during

the interrogation in light of whether a reasonable person in the suspect's position would have understood the situation to be one of custody." *State v. Quick*, 334 S.W.3d 603, 612 (Mo. App. W.D. 2011). "Custody is determined by an examination of the totality of the circumstances." *Id*. The "'reasonable person' test presupposes an innocent person." *Stricklin*, 558 S.W.3d at 61 (citing *Florida v. Bostick*, 501 U.S. 429, 438 (1991)).

Our Supreme Court has identified several factors relevant to determining whether the totality of the circumstances establish that a suspect was "in custody" at the time of questioning. *Werner*, 9 S.W.3d at 595. These factors, derived from the Eighth Circuit's analysis in *United States v. Griffin*, 922 F.2d 1343 (8th Cir. 1990), consider a suspect's freedom to leave the scene, and the purpose, place, and length of an interrogation. *Werner*, 9 S.W.3d at 595. "Indicia of custody" include:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not under arrest;
>
> (2) whether the suspect possessed unrestrained freedom of movement during questioning;
>
> (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to answer questions;
>
> (4) whether strong arm tactics or deceptive stratagems were employed during questioning;
>
> (5) whether the atmosphere was police dominated; or,
>
> (6) whether the suspect was placed under arrest at the termination of questioning.

*Werner*, 9 S.W.3d at 595 (citing *Griffin*, 922 F.2d at 1349). These indicia "are not a concrete test, but are simply factors (a non-exhaustive list of possible factors) to be

considered in the totality of the circumstances." *Quick*, 334 S.W.3d at 613. Though non-exhaustive, the "presence and absence [of the indicia of custody described in *Griffin*] guide courts in assessing the totality of the circumstances surrounding interrogations." *Werner*, 9 S.W.3d at 596. "With regard to the first three *Griffin* factors, the affirmative presence of one or more of them during questioning 'would tend to mitigate the existence of custody at the time of questioning.'" *Id.* (quoting *Griffin*, 922 F.2d at 1349). The "affirmative presence of the last three [] factors would 'tend to aggravate the existence of custody.'" *Id.*

With these factors in mind, we review the record to determine whether substantial evidence supports the trial court's finding that the State sustained its burden to establish, by a preponderance of the evidence, that Wright was not subjected to a custodial interrogation requiring her to be Mirandized.

Wright was not under arrest at the time she accompanied Penrod and Wells to the police station to give a statement. She was waiting for the Detectives to arrive at her sister's house, and voluntarily agreed to give a statement about the incident she had witnessed. Wright was not coerced or threatened to do so. Though she was transported to the police station in an unmarked police car, she had no other transportation, as the car she had driven the night before was her mother's and was damaged in the shooting. A person is not in custody merely because they travel with authorities to be questioned at a police station. *See State v. Glass*, 136 S.W.3d 496, 509-10 (Mo. banc 2004) (finding that a defendant was not in custody when the defendant rode with police to the station for questioning).

Wright was crying during the ride to the police station. However, the trial court found, and the record supports the finding, that there was no evidence to indicate or suggest

11

that Wright felt threatened or coerced to give a statement. Wright was not restrained at any time during her encounter with the Detectives. She was offered water and breaks on more than one occasion during her interview. She was left alone at times in the unlocked interview room. She was informed that her statement was desired because she had witnessed the incident, and not because she was a suspect.

When the Detectives told Wright following her initial statement that they did not believe she was telling the truth, Wright was given opportunities to change her statement or to provide additional information, but never wavered in her statement. Despite Penrod's insistence that Wright was not telling the truth, Wright's demeanor remained calm, she never appeared nervous, and she never asked to leave or end the interview. When Wright was asked to sign a form consenting to police search of her cell phone, she refused because she wanted an attorney to review the form, indicating Wright did not feel coerced and was fully capable of asserting her own wishes. At the conclusion of the relatively short (around two hour) interview, Wright was not arrested, and was returned to her sister's house. In fact, Wright was not arrested for almost two months following the interview. Where law enforcement officers have advised a witness that he or she is not under arrest, "custody has frequently been found not to exist." *Werner*, 9 S.W.3d at 596 (citing *Griffin*, 922 F.2d at 1349); *see also State v. Hill*, 247 S.W.3d 34, 48 (Mo. App. E.D. 2008) ("[A] suspect is not in custody in a situation in which the suspect voluntarily goes to a police station for questioning, is told that he or she is not under arrest, is not physically restrained, and is not arrested at the end of the interview."); *State v. Bruce*, 503 S.W.3d 354, 358 (Mo. App. S.D. 2016); *State v. Greathous*e, 627 S.W.2d 592 (Mo. 1982); *California v. Beheler*, 463 U.S.

12

1121, 1124-25 (1983); *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977); *United States v. Brave Heart*, 397 F.3d 1035, 1038-40 (8th Cir. 2005); *United States v. LeBrun*, 363 F.3d 715, 720-23 (8th Cir. 2004).

The trial court's order overruling the Motion to Suppress made factual findings that are consistent with our summarization of the record, above. We defer to those findings as they are supported by substantial evidence. Applying *de novo* review, we conclude that the trial court did not error by finding that the totality of the circumstances failed to establish that Wright was subjected to a custodial interrogation. A reasonable person, which presupposes an innocent person, would have felt she was at liberty to terminate the interrogation and was free to leave.

Wright highlights the fact that the Detectives had possession of her cell phone, and that the Detectives' questioning of her became more aggressive during the interview, to argue that the totality of the circumstances establish that she was subjected to a custodial interrogation. We disagree.

Wright argues that because the police had possession of her cell phone, a reasonable person would have believed themselves to be in custody, and not free to leave. Wright's argument is incongruent with the fact that Wright told her sister she did not need her cell phone and made no objection when Penrod took the cell phone from her sister, and with the fact that Wright verbally consented to a search of her phone during her interview. The trial court found that Wright's sister voluntarily handed Wright's cell phone to Detective Penrod, in Wright's presence, without objection from Wright. Wright never asked for her phone during the interview, and did not learn that the phone was being retained so a search

13

warrant could be secured until her interview was over. Though there is some authority for the proposition that a suspect's retention of a cell phone is a factor that weighs against finding an interrogation to be custodial, the weight of authority suggests that possession (or not) of a suspect's cell phone is not outcome determinative. *See State v. Schneider*, 483 S.W.3d 495, 503 (Mo. App. E.D. 2016) (holding that a defendant's possession of a cell phone throughout a short interview with police was an "additional factor" weighing against a finding of custody); *LeBrun*, 363 F.3d at 722 (recognizing that a suspect's "mere possession of a cellular phone without more will not transform a custodial interrogation into a noncustodial one"); *United States v. Swan*, 842 F.3d 28, 33 (1st Cir. 2016) (holding that while possession of a cell phone by police is "some evidence" of custody, it is not outcome determinative evidence); *see also United States v. Campbell*, 741 F.3d 251, 267 (1st Cir. 2013); *Commonwealth v. Yandamuri*, 159 A.3d 503, 520-21 (Pa. 2017); *State v. Daniell*, 817 S.E.2d 358, 360 (Ga. Ct. App. 2018). The Detectives' possession of Wright's phone is thus not dispositive, and when viewed as a part of the totality of the circumstance, does not support the conclusion that a reasonable person would believe they were not free to leave. *See, e.g., Yandamuri*, 159 A.3d at 520-21 (finding there was no "significant restriction on [] freedom of movement" even when the defendant was questioned at the station house while police possessed his cell phone and car keys and the defendant never stated he wanted to leave, asked to stop the questioning, and never refused to answer questions).

Wright also argues that she was confronted with "guilt-seeking questions" during her interview, as she was accused of not telling the truth. Wright's argument ignores that,

14

for the bulk of the interview, the Detectives were asking Wright to explain her version of events, including such matters as the route she took while driving to and from the dance hall; how she and Ramsey entered and exited the dance hall; what they did at the party before being confronted by Jones; and what Wright and Ramsey were wearing. During the majority of the interview, the Detectives did not confront or challenge Wright's account, other than to ask follow up questions. But even as the Detectives' questioning grew more pointed toward the end, "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Mathiason*, 429 U.S. at 495. "[A]ccusatory questioning ha[s] little to do with how a person . . . would [] perceive his freedom to leave," especially where the suspect is "not physically restrained in any way," and his ability to leave is "not condition[ed] . . . on providing . . . information." *Brave Heart*, 397 F.3d at 1040. An interview is not converted to a custodial interrogation merely because the person questioned is one whom the police suspect. *Mathiason*, 429 U.S. at 495 (1977). And here, though questioning of Wright became more pointed late in the interview, the Detectives' demeanor was not overtly accusatory, but remained cordial and respectful.

Wright nonetheless argues that the interrogation tactics employed during her interview converted her interview into a custodial interrogation because she requested an

attorney.[5]  She relies on *State v. Stricklin*, 558 S.W.3d 54 (Mo. App. E.D. 2018).  *Stricklin* is distinguishable.

In *Stricklin*, a defendant voluntarily went to the police station to answer questions about the sexual abuse of his girlfriend's daughter.  558 S.W.3d at 58.  Stricklin was told he was a suspect in the abuse, but denied any involvement in the abuse, despite interrogation that suggested the officers knew more than the defendant was being told.  *Id*.  Stricklin continued to deny his involvement, even when the officers' accusations against him became more direct, accusatory and argumentative.  *Id*. at 59.  Then, one of the officers told Stricklin he was going to step out of the room, leaving him with a second officer.  *Id*.  The departing officer told Stricklin that when he came back, "if you haven't settled this up, and straightened it out, you're probably going.  You're going in cuffs.  I don't believe you for one minute."  *Id*.  Stricklin replied, "I want a lawyer.  Right now."  *Id*.  Stricklin's interrogation continued, and Stricklin began attempting to negotiate to turn himself in if he could have a day or two to get his affairs in order.  *Id*. at 59-60.  When told that could not be assured, Stricklin once again demanded a lawyer.  *Id*.  Ultimately, Stricklin admitted, in a handwritten letter to the victim's mother, that he had assaulted the victim.  *Id*.

Under the totality of these circumstances, our Eastern District held that Stricklin's interview was ***not custodial*** when it began.  *Id*. at 64.  That is significant.  Though Stricklin voluntarily agreed to participate in the interview at the police station, and was not under

---

[5]In her Brief, Wright claims she asked to speak to counsel on three occasions during her interview.  Two of those occasions involved, however, a limited request to have counsel review the written consent form to search her cell phone.  Those requests are immaterial to our assessment of whether Wright was subjected to a custodial interrogation.

arrest at the beginning of the interview, he knew from the beginning of the interview that he was a suspect, and had asked for an attorney *before* the point in the interview at which the Eastern District found that he was in custody. Wright voluntarily agreed to be interviewed at the police station and was not under arrest, and was told she was *not* a suspect and was merely being interviewed as a witness. As in *Stricklin*, we similarly conclude that Wright was not subjected to a custodial interrogation initially.

The Eastern District recognized, however, that "[a]n interview can start as an investigative interview, and then at some point be transformed into an in-custody interview." *Id.* at 62 (citing *Quick*, 334 S.W.3d at 616; *Brooks*, 185 S.W.3d at 281). Applying this settled principle, the Eastern District held that the interrogation became custodial when Stricklin, who had been expressly accused of abusing the victim and causing her injuries, was told that he would be "going in cuffs" if he did not "straighten[] it out." *Id.* at 64. The Eastern District reasoned that at that point, "a reasonable person would not believe . . . that he or she could leave or terminate the interview," as Stricklin knew officers believed he had committed the crime, and was told he was not going to be free to leave at the end of the interview. *Id.* (citing *Brooks*, 185 S.W.3d at 282) (which held that an interrogation changed to custodial when an officer restricted a suspect's freedom by telling the suspect she could leave "after this," suggesting the suspect was not free to leave until permitted to do so). In sharp contrast, Wright was never told that she was a suspect, and was expressly told she was not a suspect. Though the questioning of Wright became more aggressive, in context that questioning challenged whether Wright was covering for someone else. Wright was never threatened with arrest, and her freedom

to leave was never challenged by a suggestion that unless she changed her story she would be arrested. In addition, Wright did not ask for an attorney until approximately 80% of the interview had been concluded, unlike in *Stricklin*, where the suspect asked for an attorney early in his interrogation.

It is true that both Stricklin and Wright requested an attorney during their interviews. However, the Eastern District did not treat Stricklin's request for an attorney as dispositive on the issue of the custodial nature of his interrogation, as it did ***not*** find that custody commenced with the request. Instead, the request for counsel was viewed as consistent with the conclusion that a reasonable person would not feel free to leave once Stricklin was threatened with arrest. *Id*. at 64. Though Wright requested an attorney when Penrod told Wright he did not believe she was being truthful, Wright was told she was not a suspect and was never threatened with arrest. Wright's request for counsel is not, on its own, sufficient to convert her noncustodial interrogation into a custodial one. It is but a single factor to be considered in the totality of the circumstances to determine whether a reasonable person, (a presumptively innocent person), would believe themselves no longer free to leave. A determination of custody "depends on the objective circumstances of the interrogation, not on the subjective views harbored by . . . the person being questioned." *Hill*, 247 S.W.3d at 47.

Because Wright's request for an attorney did not convert her non-custodial interview into a custodial interrogation, her request did not have to be honored. The right to counsel under the Fifth Amendment, as interpreted in *Miranda*, ***does not apply*** to non-custodial settings. *See State v. Brown*, 18 S.W.3d 482, 484-85 (Mo. App. E.D. 2000) (citing *McNeil*

18

*v. Wisconsin*, 501 U.S. 171, 182 n. 3 (1991) ("We have in fact ***never held*** that a person can invoke his Miranda rights anticipatorily, in a context other than 'custodial interrogation'"). Thus, the Detectives were under no obligation to refrain from further questioning of Wright merely because she requested counsel, as Wright was not being subjected to a custodial interrogation. *See State v. Seibert*, 103 S.W.3d 295, 300 (Mo. App. S.D. 2003) ("The *Miranda* right to counsel is not triggered . . . during non-custodial interrogations.").

Even were we to conclude (which we do not) that based on the totality of the circumstances, Wright's interview converted to a custodial interrogation when Penrod's challenges to the veracity of her statement led Wright to request an attorney, the trial court's denial of the Motion to Suppress was not error. Wright's Motion to Suppress sought to exclude the entirety of her statement. Wright never sought to exclude only that portion of her statement which occurred after her request for counsel. A lawfully obtained non-custodial statement is not rendered inadmissible simply because a subsequent statement is obtained under the cloud of a *Miranda* violation. *See Brooks*, 185 S.W.3d at 280-82. Consistent with this principle, in *Stricklin*, the only portion of the statement that was subject to suppression on *Miranda* grounds was that portion after the interrogation became custodial. *Stricklin*, 558 S.W.3d at 68.

Even if we generously read the Motion to Suppress to challenge the admissibility of all or any portion of Wright's statement, and even were we to conclude (which we do not) that admission of the portion of Wright's statement which followed her request for counsel violated her right against self-incrimination, automatic reversal of Wright's convictions would not be warranted. *State v. Ramirez*, 447 S.W.3d 792, 797 (Mo. App. W.D. 2014)

19

(citing *Chapman v. California*, 386 U.S. 18 (1967)). It is harmless error to admit statements obtained in violation of *Miranda* when the violating statements are cumulative of other admitted statements that were lawfully obtained. *State v. Baskerville*, 616 S.W.2d 839, 843-44 (Mo. 1981). Unlike the circumstances in *Stricklin*, where Stricklin changed his initial statement and admitted to the crime after his interrogation became custodial, Wright's statement never wavered. Wright's statement after she requested an attorney was no different than her statement before she requested an attorney and was therefore cumulative of lawfully admitted portions of her statement.

Finally, though unrelated to the totality of the circumstances surrounding her interview, Wright also argues that the trial court erred in denying her Motion to Suppress because the State's initial written response to the Motion to Suppress "conced[ed] the suppression of Wright's statement." Wright is referring to the fact that the State's initial response to the Motion to Suppress agreed Wright's statement should be suppressed because Wright requested an attorney during the statement. However, not long thereafter, the State filed a supplemental response to the Motion to Suppress which withdrew this concession, and which argued that Wright had not been subjected to a custodial interrogation. The supplemental response was filed more than three months before the hearing on Wright's Motion to Suppress.

Wright does not argue that the State's initial concession judicially estopped the State, and we would question, in any event, application of that principle here.[6] Rather, Wright

---

[6]"Judicial estoppel applies to prevent litigants from taking a positon in one judicial proceeding, thereby obtaining benefits from that position in that instance and later, in a second proceeding, taking a contrary position in order to obtain benefits from such a contrary position at that time." *Vinson v. Vinson*, 243 S.W.3d 418, 422 (Mo.

20

argues that the State's belief at the time of its initial response to the Motion to Suppress is relevant to assessing the totality of the circumstances at the time of Wright's statement. We disagree.

At the motion hearing, the State explained that its initial response was filed before talking with Penrod and Wells. The author of the initial response was not a participant in Wright's interview, and had no first-hand knowledge of the circumstances of the interview. Instead, the author of the initial response to the Motion to Suppress was operating under the legal misapprehension that Wright's request for an attorney was dispositive of whether her interrogation was custodial. We have already explained that is not the case. The State's initial concession is immaterial to our assessment of whether the totality of the circumstances establish that Wright was subjected to a custodial interrogation.

The trial court did not clearly err in denying Wright's Motion to Suppress and admitting her recorded statements at trial. Under the totality of the circumstances, the State sustained its burden to establish by a preponderance of evidence that Wright was not in custody at the time of her statement.

Point One is denied.

**Points Two and Three**

Wright's second and third points assert similar claims of instructional error. Wright's second point argues that the trial court erred in instructing the jury on the offense

---

App. E.D. 2007) (overruled on other grounds). In contrast, the State's change in position occurred in the same single proceeding, and before it obtained any benefits from its first (unfavorable) position. Moreover, "the doctrine [of judicial estoppel] does not apply when a party's prior position was taken because of a good-faith mistake rather than as part of a scheme to mislead and manipulate the court." *Loth v. Union Pacific R. Co*., 354 S.W.3d 635, 638 (Mo. App. E.D. 2011).

21

of involuntary manslaughter because Instruction No. 11, the verdict director, misled the jury by permitting the jury to find guilt if "Ramon Boyd or defendant recklessly caused the death" of Jones. Wright argues that "by submitting the mental state element in the disjunctive the court was unable to ensure a unanimous jury verdict." Wright's third point on appeal similarly argues that the trial court erred in instructing the jury on the offense of assault in the second degree because Instruction No. 23, the verdict director, misled the jury by permitting the jury to find guilt if "Ramon Boyd or defendant recklessly caused serious physical injury" to Ramsey. Wright argues that the inability to ensure a unanimous jury verdict on an essential element of these crimes deprived her of her constitutional right to unanimous jury verdicts.

"Appellate review of preserved error in instructing a jury will result in the reversal of a trial court's instructional decision 'only if the instructional error misled the jury and, thereby, prejudiced the defendant.'" *State v. Nelson*, 505 S.W.3d 437, 444 (Mo. App. W.D. 2016) (quoting *State v. Zetina−Torres*, 482 S.W.3d 801, 810 (Mo. banc 2016)).

The State argues that Wright failed to preserve her points on appeal because although Wright objected to the disjunctive nature of the verdict directors at trial, she only generally argued that the use of a disjunctive would mislead the jury, and did not specifically argue that the use of a disjunctive would violate her constitutional right to a unanimous jury verdict. We need not address whether Wright's objections at trial were sufficient to preserve the specific claim of error raised on appeal. Even presuming Wright properly preserved this issue for our review, the trial court did not err in submitting Instructions No. 11 and 23.

22

Instruction No. 11 provided, in relevant part:

A person is responsible for her own conduct and she is also responsible for the conduct of another person in committing an offense if she acts with the other person with the common purpose of committing that offense or if, for the purpose of committing that offense, she aids or encourages the other person in committing it.

As to Count I, if you find and believe from the evidence beyond a reasonable doubt:

First, that on or about January 1, 2016, in the County of Jackson, State of Missouri, Ramon Boyd caused the death of Sederick Jones by shooting him, and

Second, *that Ramon Boyd or* [*Wright*] *recklessly caused the death of Sederick Jones,*

then you are instructed that the offense of involuntary manslaughter has *occurred*, and if you further find and believe from the evidence beyond a reasonable doubt:

Third, that with the purpose of promoting or furthering the commission of involuntary manslaughter, [Wright] aided or encouraged Ramon Boyd in committing involuntary manslaughter,

*then you will find defendant guilty* . . . of involuntary manslaughter in the first degree.

(Emphasis added.) Instruction No. 23 read similarly, instructing the jury in paragraph First that assault in the second degree *occurred* if the jury found that "*Ramon Boyd or [Wright] recklessly caused serious physical injury to Kierra Ramsey by shooting her*," and in paragraph Second that a finding of *guilt* was required if Wright acted "with the purpose of promoting or furthering the commission of involuntary manslaughter" to "aide[] or encourage[] Ramon Boyd in committing assault in the second degree." (Emphasis added.)

23

Both Instructions were patterned after MAI-CR 3d 304.04 regarding a defendant's responsibility for conduct of another person. MAI-CR 3d 304.04 is drawn from sections 562.036[7] and 562.041. Section 562.036 provides that "a person with the required culpable mental state is guilty of an offense if it is committed by his or her own conduct or by the conduct of another person for which he or she is criminally responsible, or both." Section 562.041 provides that a person is criminally responsible for the conduct of another when "with the purpose of promoting the commission of an offense, he or she aids or agrees to aid or attempts to aid such other person in planning, committing or attempting to commit the offense." Section 562.041.1(2). Consistent with these statutes, MAI-CR 3d 304.04 permits the submission of a disjunctive when referring to the person who committed the conduct which constitutes the crime charged, if the evidence is sufficient to support each of the alternative submissions. MAI-CR 3d 304.04, Notes on Use 5(b), (c).[8] *See State v. Shockley*, 98 S.W.3d 885, 891 (Mo. App. S.D. 2003) (holding that "disjunctive submission of alternative means by which a single crime can be committed is proper . . . if the alternative submissions are each supported by the evidence").

Here, Wright does not dispute that there was sufficient evidence to support the alternative submission that either she or Boyd committed the crime charged in each verdict director. Wright does not argue that the verdict directors failed to comply with the Missouri

---

[7]All statutory references are to RSMo 2016, as supplemented through the date of the offense on January 1, 2016, unless otherwise indicated.

[8]Missouri law provides that a person may be held criminally responsible for the conduct of another when she "aides or agrees to aid or attempts to aid such person in planning, committing or attempting to commit the offense." Section 562.041.1(2). "The Notes on Use [for MAI-CR3d 304.04], specifically 5(c), indicate that the accomplice liability instruction applies when the evidence is not clear whether the defendant acted alone or with an accomplice." *State v. Shockley*, 98 S.W.3d 885, 891 (Mo. App. S.D. 2003).

Approved Instructions. And Wright does not argue that MAI-CR 3d 304.04 misstates the law on accomplice liability. Instead, Wright asserts that the disjunctive submission authorized by law and the Missouri Approved Instructions deprived her of jury unanimity because jurors could have disagreed about whether it was she *or* Boyd who committed each charged offense with the requisite mental state. Wright relies on *State v. Celis-Garcia*, 344 S.W.3d 150 (Mo. banc 2011). Wright's reliance on *Celis-Garcia* is unavailing.

In *Celis-Garcia*, a defendant was charged with two counts of first degree statutory sodomy against two victims. *Celis-Garcia*, 344 S.W.3d at 152. At trial, evidence was presented of multiple acts of statutory sodomy against each victim. *Id.* The State submitted jury instructions that required the jury to find that *an* act of statutory sodomy occurred within a time frame, but did not require the jury to agree on the specific act of statutory sodomy, though several acts sufficient to permit a finding of guilt were referred to in the evidence. *Id.*

Our Supreme Court found that in multiple act cases, a defendant's right to a unanimous jury verdict as ensured by article 1, section 22(a) of the Missouri Constitution, can be violated without carefully crafted jury instructions. The Court defined a multiple acts case as arising "when there is evidence of multiple, distinct criminal acts, each of which could serve as the basis for a criminal charge, but the defendant is charged with those acts in a single count." *Id.* at 155-56. Because the verdict directors in *Celis-Garcia* "permitted the jury to convict [defendant] of two counts of sodomy without identifying the acts the jurors were to agree she committed," the Supreme Court found plain error,

25

"because it was impossible to determine whether the jury unanimously agreed on any one of [the] separate incidents [of sodomy]" described in the evidence. *Id.* at 158.

*Celis-Garcia* does not apply here. This is not a multiple acts case. The State introduced evidence of one act of involuntary manslaughter (involving Jones) and one act of assault (involving Ramsey). To find that each charged offense occurred, it was wholly proper for the jury to find that either Boyd *or* Wright acted recklessly to cause Jones' death and to cause serious injury to Ramsey. Stated another way, to find that both involuntary manslaughter and assault occurred, a unanimous verdict was ensured so long as each juror believed that either Boyd *or* Jones committed the offense with the requisite mental state described in the verdict director. The single act of involuntary manslaughter and the single act of assault could be committed either way, without impacting criminal culpability for the act. "[T]he disjunctive use is proper since the jury could find that either person committed the act." *Shockley*, 98 S.W.3d at 892; *see also State v. Biggs*, 170 S.W.3d 498, 504 (Mo. App. W.D. 2005) (reasoning that "whether [defendant] committed all, some, or none of the conduct elements is irrelevant. [Defendant] is guilty of the crime charged if he aided or acted together with [accomplice] in the commission of the crime").

The trial court did not err in submitting Instructions No. 11 and 23 because the disjunctive submission about which Wright complains did not implicate the unanimity of the jurors' findings that an act of involuntary manslaughter in the first degree and an act of assault in the second degree occurred, and that Wright was responsible for both acts on a theory of accomplice liability.

Points Two and Three are denied.

26

## Conclusion

The trial court's Judgment is affirmed.

_Cynthia L. Martin_

Cynthia L. Martin, Judge

All concur